**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 13-37200 |
| | § | |
| GOLDKING HOLDINGS, LLC, et al., | § | |
| | § | Chapter 11 |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |

_____

| | | |
|---|---|---|
| | § | |
| GOLDKING ONSHORE OPERATING, LLC, | § | |
| GOLDKING RESOURCES, LLC, | § | |
| AND GOLDKING HOLDINGS, LLC, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Adv. Proc. No. 14-03144 |
| | § | (Removed from the 61st Judicial |
| LEONARD C. TALLERINE, JR., | § | District Court, Harris County, Texas) |
| GOLDKING ENERGY CORPORATION, | § | |
| GOLDKING ENERGY PARTNERS I, LP, | § | |
| GOLDKING ENERGY PARTNERS, II, LLC, | § | |
| GOLDKING CAPITAL | § | |
| MANAGEMENT, LLC, RETA | § | |
| WELLWOOD D/B/A | § | |
| VERMILLION CONTRACTING CO., | § | |
| DENNA RAMSEY AND | § | |
| PAUL CULOTTA | § | |
| | § | |
| *Defendants.* | § | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT

Goldking Onshore Operating, LLC ("GOO"), Goldking Resources, LLC ("Resources"),

and Goldking Holdings, LLC ("GKH") (collectively "Plaintiffs" or "Debtors") file this Second

Amended Complaint[1] ("Complaint") against Leonard C. Tallerine, Jr. ("Tallerine"), Goldking Energy Corporation ("GEC"), Goldking Energy Partners I, LP ("GEP I"), Goldking Energy Partners II, LLC ("GEP II"), Goldking Capital Management, LLC ("GCM"), Reta Wellwood dba Vermillion Contracting Co. ("Vermillion"), Denna Ramsey ("Ramsey"), and Paul Culotta ("Cullota") (collectively the "Defendants"), and in support thereof would show the Court the following:

## I.  NATURE OF THE ACTION

1.       Tallerine served as the President and CEO of Plaintiffs GOO and GKH beginning in September of 2010.  In blatant disregard of his fiduciary duties and any notion of business ethics, Tallerine—with the help of his trusted subordinates and fellow, hand-picked employees, Ramsey and Culotta—engaged in a calculated and pervasive scheme to embezzle substantial and material amounts of money from GOO's operating accounts for his and his cohorts' personal financial gain and use.  Starting with the very first days of his employment and continuing until he was terminated, Tallerine and the other Defendants employed a wide range of deceptive and elaborate acts to drain GOO's cash for Tallerine's personal benefit, including: (i) wiring GOO funds directly to Tallerine's personal bank account or the accounts of entities owned by Tallerine; (ii) directing GOO to pay Tallerine's personal expenses that were unrelated to GOO business; (iii) receiving significant cash advances for business travel without the proper approvals and then failing to provide a subsequent true-up of actual expenses incurred; (iv) submitting fabricated invoices from fake vendors and doctored invoices from real vendors to GOO for payment to Tallerine and his affiliates or to pay for Tallerine's personal expenses; (v)

---

[1]  This Second Amended Complaint is filed pursuant to the Court's severance and consolidation of matters concerning these styled parties into Adversary Proceeding 14-03144, with any matters and disputes concerning issues involving claims by and between the Debtors and Louis Belanger being moved into Adversary Number 14-03146.

invoicing GOO for employees' work already paid and performed for another entity Tallerine controlled, which funds Tallerine and his affiliates kept for themselves; (vi) stealing checks payable to GOO and depositing them in accounts of entities owned by Tallerine; (vii) stealing GOO checks made out to GOO vendors and depositing them in accounts of entities owned by Tallerine; and (viii) using GOO employees and assets for other personal business ventures.

2.      Tallerine never revealed this conduct to his fellow members of GKH's Board of Managers or to anyone at Wayzata Opportunities Fund II, LP ("Wayzata"), the majority interest owner of GKH, of which GOO is a wholly-owned subsidiary.  In fact, Tallerine, Culotta and Ramsey endeavored to keep these acts hidden from Wayzata.  These were not isolated events that amounted to simple "mistakes," as Tallerine has suggested.  Tallerine used the very same tactics to embezzle substantial funds from at least two entities with which he was involved prior to Plaintiffs.  In reality, Tallerine treated GOO as his personal piggy bank, looting GOO at will to support his personal investments and lavish lifestyle, and to pay people who performed personal work or services for him.  By the time he was caught by GOO accounting staff, Tallerine had stolen or diverted over a million dollars from GOO's operating account, only a portion of which he acknowledged and paid back (without revealing either the repayment or the initial transfers to other members of the Board of Managers or Wayzata).  The only reason Tallerine paid any of these proceeds back was because accounting staff at GOO confronted Tallerine and insisted upon it.

3.      In the fall of 2012, at a time when GOO was in default on its line of credit with Bank of America, Tallerine once again used GOO funds for a clearly improper purpose: the funding of a DIP loan related to Tallerine's acquisition of a restaurant in New Orleans.  Around this time, Wayzata received an anonymous call from a member of the GOO accounting staff

suggesting that Wayzata investigate Goldking. Wayzata ultimately retained professionals to investigate the matter and uncovered multiple instances of misconduct by Defendants.

4.     By the time Tallerine was removed for gross fiduciary misconduct in December 2012, his mismanagement of Plaintiffs' business and outright theft and misappropriation of company funds had largely consumed over $70 million in invested capital and debt financing, rendering Plaintiffs without resources to continue development. The losses to Wayzata, who subsequently took out the secured bank financing that went into default during Tallerine's mismanagement, have reached a staggering level, with additional losses accruing to Plaintiffs' vendors.

5.     Proofs of claim have now also been filed by (i) Tallerine (claim #131) against GKH (the "Tallerine Claim"), (ii) GEC (claim #24) against GOO (the "GEC Claim"), and (iii) Culotta (claim #19) against GOO (the "Culotta Claim") (collectively, the "Claims"), with each claimant (collectively the "Claimants") seeking recovery from the Debtors' estates. In addition to the affirmative relief sought by the Plaintiffs, they also object to, and seek affirmative recovery from, or subordination of, these Claimants on the grounds that (i) the amounts claimed are excessive, in violation of operative agreements, and without basis; (ii) the Claims are subject to offset, recoupment, or disallowance by virtue of violation of the automatic stay and on account of affirmative claims made by the Debtors against each relating to the conversion and misappropriation of monies or property of the Debtors; (iii) each of the Claimants has claims against them rendering the Claims disallowed by operation of section 502; and (iv) each of the Claims are subject to equitable subordination.

6.     Plaintiffs bring this action against Tallerine and the other Defendants for conversion, violation of the Theft Liability Act, breach of fiduciary duty, fraud, unjust

enrichment, business disparagement, aiding and abetting fraud and breach of fiduciary duty, conspiracy, breach of contract, breach of the covenant of good faith and fair dealing, fraudulent transfer and equitable subordination.  Plaintiffs seek recovery of actual and exemplary damages, disgorgement, and their attorneys' fees.  Plaintiffs also seek to disallow or subordinate the Claimants' proofs of claim.

## II.  PARTIES

7.      Plaintiff GOO is a Delaware Limited Liability Company with its principal place of business at Two Shell Plaza, 777 Walker Street, Suite 2500, Houston, Texas 77002.

8.      Plaintiff Resources is a Delaware Limited Liability Company with its principal place of business at Two Shell Plaza, 777 Walker Street, Suite 2500, Houston, Texas 77002.

9.      Plaintiff GKH is a Delaware Limited Liability Company with its principal place of business at Two Shell Plaza, 777 Walker Street, Suite 2500, Houston, Texas 77002.

10.      Defendant Tallerine is an individual residing in Houston, Texas.  Tallerine is the former President and CEO of Plaintiffs GOO and GKH and was a member of the Board of Managers of GKH.  Mr. Tallerine has made an appearance in this case.

11.      Defendant GEC is a Texas corporation with its principal place of business in Houston, Texas.  GEC has made an appearance in this case.

12.      Defendant GEP I is a Texas limited partnership with its principal place of business in Dallas, Texas.  GEP I has made an appearance in this case.

13.      Defendant GEP II is a Texas Limited Liability Company with its principal place of business in Houston, Texas.  GEP II has made an appearance in this case.

14.      Defendant GCM is a Texas limited liability company with its principal place of business in Houston, Texas.  GCM has made an appearance in this case.

15.     Defendant Vermillion is an entity doing business in Texas.  Vermillion has made an appearance in this case.

16.     Defendant Ramsey is an individual residing in Houston, Texas.  Ramsey is the former Assistant Vice President and Assistant Treasurer of Plaintiff GOO.  Ramsey has made an appearance in this case.

17.     Defendant Culotta is an individual residing in Houston, Texas.  Culotta is the former Senior Vice President Corporate Planning, Budget and Analysis of Plaintiff  GOO.  Culotta has made an appearance in this case.

### III.   JURISDICTION & VENUE

18.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1334(b) because it is "related to" a pending title 11 bankruptcy proceeding and because it involves resolution of proofs of claim filed in the bankruptcy cases.  This Court is presiding over the above-captioned, jointly administered chapter 11 bankruptcy cases of the Debtors pursuant to the general reference with respect to title 11 cases in the Southern District of Texas and 28 U.S.C. § 152.  The action is therefore removable to this Court pursuant to 28 U.S.C. § 1452(a), 28 U.S.C. § 157 and General Order 2012-6 of the United States District Court for the Southern District of Texas, and it comprises a core proceeding in bankruptcy and as to any matters that are noncore, they are properly addressed here as inextricably intertwined with the core matters.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV.  FACTUAL ALLEGATIONS

**Allegations Relating to Defenants' Conversion and Misppropriation
of Plaintiffs' Funds and Other Wrongful Conduct**

20.     Plaintiff GOO is an oil and gas exploration company headquartered in Houston, Texas.  GOO's primary focus is acquiring and developing oil and gas properties located in

Louisiana and Texas, including state waters.  GOO is a wholly owned subsidiary of Plaintiff GKH.

21.     Wayzata is the majority member of GKH and holds approximately a 93.75% ownership interest.  The minority member is Goldking LT Capital Corp. ("LT Capital"), an entity owned by Defendant Tallerine, which holds approximately a 6.25% ownership interest.[2] In addition to his membership interest in GKH, Tallerine individually served on the Board of Managers of GKH.

22.     Both GKH and GOO were formed in 2010.  At the time of formation, GKH was owned 93.75% by Wayzata, and 6.25% by GK-LT, an entity wholly-owned by Tallerine. Tallerine served as President and CEO of both entities from their inception until he was removed in mid-December 2012 after Wayzata confirmed his misconduct.  As explained in detail below, at every turn, Tallerine treated GOO as his personal slush fund, stealing and diverting well over $1,000,000 of GOO's cash for his own personal use through a legion of deceptive means. Tallerine expended a substantial and material amount of GOO's cash and working capital by directing or authorizing its use for non-GOO expenditures, including payments that benefitted himself, his family members, his co-conspirators, and entities that he owns.  Tallerine embezzled GOO funds directly into his own accounts or accounts for other businesses he owns, directed GOO to pay invoices that related to his personal expenses, as opposed to corporate expenses, and created bogus contractors and submitted fraudulent invoices in an attempt to "cover up" GOO's payment of his personal expenses.  Tallerine accomplished this systematic misappropriation of corporate assets with the help of his longtime personal assistant, former GOO Vice President and

---

[2] LT Capital has failed and refused to make capital calls, and thus its ownership percentage may change.

Assistant Treasurer Ramsey, and his colleague, former GOO Senior Vice President Corporate Planning, Budget and Analysis Culotta.[3]

23.     Tallerine's widespread looting of GOO funds directly harmed GOO's financial condition by causing shortfalls in GOO's operating cash and negative cash balances in its operating bank account.   Despite the damage being done to the company, Tallerine's actions were not disclosed to GKH's Board or Wayzata, GKH's majority member.   Indeed, based on GOO's internal records, Tallerine, Ramsey, and Culotta attempted to disguise the breadth and amount of GOO's cash that they had diverted.   When Wayzata discovered and confirmed Tallerine and the other Defendants' systematic illegal conduct in December 2012, GOO and GKH terminated the employment of Defendants Tallerine and Ramsey.   Culotta had been terminated from his position as Senior VP Corporate Planning, Budget and Analysis in December 2011 for other reasons, well before his role in Tallerine's scheme was uncovered. Even after his termination, Culotta continued to assist Tallerine in continuing to cover up his wrongful scheme from Wayzata and the other members of the Board of Managers by making certain that Plaintiffs' 2011 audit did not reveal any of these transactions to Wayzata or other members of the Board of Managers.

24.     Plaintiffs' initial investigation has revealed this was not Tallerine's first foray into corporate embezzlement, and that he used some of the same deceptive tactics with entities that he previously had been entrusted to oversee.   For example, while he was the Chief Restructuring Officer of East Cameron Partners ("ECP") in connection with ECP's bankruptcy in the Western District of Louisiana, he (by creating fake invoices or altering existing ones) caused ECP to pay over $100,000 to a contractor who remodeled his personal residence and an interior designer for

---

[3] GOO and Culotta entered into a Separation Agreement, which included mutual general releases, dated December 31, 2011.  Plaintiffs' claims against Culotta in this action relate only to actions taken after the date of the release.

another home, and paid $23,000 to a sham contractor that is dba of one of his ex-wives.  And, like he did here, Tallerine used ECP's bank account as a free line of credit, to the tune of about $1.2 million in unauthorized withdrawals and transfers over time.

25.    Because of the nature and scale of Tallerine's scheme to defraud GKH and GOO, Plaintiffs' investigation into Defendants' wrongdoing is still ongoing.   Indeed, Plaintiffs anticipate that the true scope of Defendants' schemes will be larger, and include other bogus vendors and improper transfers to third parties.  Plaintiffs will amend as additional wrongful conduct is discovered.

A.    **Tallerine's Intentional Misrepresentations and Falsifying of Invoices to Obtain Wrongful Reimbursement from GOO**

26.    From his very first days working for GOO and GKH, Tallerine submitted false requests for reimbursement of "transition costs" to GOO on behalf of Defendant GEC for alleged services that were not actually provided to GOO.  For example, in late 2010/early 2011, Tallerine requested reimbursement on behalf of GEC for an invoice from Cawley Gillespie, a reservoir engineering company that he represented had performed GOO-related work, which he claimed that he had paid from his personal funds at GEC.   Based on these representations, GOO reimbursed GEC for the $18,092.48 allegedly paid to Cawley Gillespie.  This invoice, as it turns out, was doctored and had nothing to do with GOO.  However, defrauding GOO once was not good enough.  After being paid once on this fraudulent invoice, Tallerine sought payment again several months later.  On September 24, 2011, Tallerine, with Ramsey's assistance, requested reimbursement and caused GOO to pay Cawley Gillespie $18,092.48—the exact same amount Tallerine had represented he and/or GEC had already paid to the vendor.  GOO's investigation of the invoice uncovered that not only had Tallerine not paid Cawley Gillespie as he originally reported, he had also submitted a fake Cawley Gillespie invoice to support his initial

reimbursement.  Indeed, Tallerine and/or someone acting at his direction had altered the original Cawley Gillespie invoice to hide that it was for work related to Tallerine's personal investments, not GOO's business.  In short, Tallerine caused GOO to pay a fraudulent invoice (that had nothing to do with GOO business) two times: once for his own personal benefit and once to the vendor.

27.     Equally as deceptive, shortly after GOO had formed but before its payroll procedures were put in place, Tallerine submitted reimbursement requests—again, on behalf of his entity GEC—to GOO for alleged employee payroll costs for work allegedly performed on GOO-related business (specifically, the acquisition of a set of oil and gas properties known as the "White Oak Acquisition").  In reality, much of the employees' time was spent working for Walker Street Consulting, which, upon information and belief is another of Tallerine's personal ventures even though it may be technically owned by Culotta.  Walker Street Consulting managed assets sold by East Cameron Partners ("ECP")—for which Tallerine's entity GCM served as Chief Restructuring Officer in the company's bankruptcy proceeding—to EC Offshore Properties, Inc.  But Walker Street Consulting had already paid those employees for their work via its receipt of $127,500 per month from ECP.  GOO paid approximately $200,000 in false salary/wage claims for June through October 2010, which were not passed on to the employees, but instead were deposited in Tallerine's GEC business account for his personal use.

28.     In addition, Tallerine and Ramsey created a bogus vendor, Defendant Vermillion, and authorized GOO to pay over $24,000 in false invoices to Vermillion, whose accounts Tallerine and Ramsey controlled.  Specifically, GOO paid Vermillion $3,750 on November 7, 2010; $1,500 on December 15, 2010; $7,750 on April 30, 2011; and $11,000 on November 16, 2011.  Vermillion is the assumed "doing business as" name of Reta Wellwood, one of Tallerine's

ex-wives.  But Reta Wellwood was the "owner" of Vermillion in name only; the entity was operated entirely by Tallerine and Ramsey – from within GOO's office.  Tallerine and Ramsey created and submitted false invoices from Vermillion to GOO for alleged work that was not performed at various oil fields and wells. When the veracity of Vermillion's "work" was questioned, Tallerine intimidated a GOO employee into "authorizing" the expenses so that Tallerine could get paid.   Tallerine deliberately concealed, and has never disclosed, his relationship and involvement with Vermillion to GOO, GKH, GKH's Board or Wayzata.

29.     On May 26, 2011, Tallerine and/or Ramsey falsified another invoice and submitted it to GOO for payment.  Specifically, a vendor named Anderson and Sons Boatlifts, Inc. provided services at a residence in Jamaica Beach in Galveston related to a boat ramp. Upon information and belief, the Galveston residence is (or was) owned by Ramsey or Tallerine in some capacity.  Anderson and Sons Boatlifts, Inc. provided an estimate of the work to Ramsey and Cal Ray (Tallerine's pilot).  Tallerine and/or Ramsey altered and/or falsified this estimate to make it appear that it was a GOO-related expense and presented it for payment.  Tallerine and/or Ramsey: (i) altered the "Anderson and Sons Boatlifts" logo by deleting "and Sons Boatlifts" from the name (so that the vendor name appeared only as Anderson) and removing the boat sails from the graphic; (ii) blacked out the location of the services as being on Jamaica Beach, and wrote "NM!," an abbreviation for "Nine Mile" Point, a location where GOO does own properties; (iii) deleted terms such as "boat lift," "jet ski cradle," "slip," and "Rinker outboard;" and (iv) typed at the bottom, in a different font, "CASH PRICE" $3,000.  Based on this false invoice, GOO issued a check in the amount of $3,000.00 to Cal Ray (who GOO was told would pay the vendor directly).  Tallerine falsely coded this invoice as a GOO operating expense chargeable to the Nine Mile Point property.

30.     Tallerine also coerced Jim Wible, another GOO employee, to create a false invoice for a bogus GOO-related expense.  Specifically, upon information and belief, Tallerine requested that Mr. Wible seek reimbursement from GOO for $1,000.00 for Tallerine's purchase of a gift for the son of a Wayzata executive.  Mr. Wible's April 2012 expense report submits what is, upon information and belief, a false invoice for catering of food from "Bayou Crawfish & Catering" in the amount of $1,000.00.  GOO "reimbursed" this false expense on May 25, 2012.

**B.     Tallerine Steals Checks Payable to GOO and Deposits Them Into His Personal Accounts**

31.     Tallerine, with Ramsey's assistance, stole checks payable to GOO and intentionally deposited them into accounts owned by Tallerine's personal, non-GOO related entities.  For example:

(a)     In 2010, GOO renovated its office space at Two Shell Plaza.  Hines, the building's management company, agreed to reimburse GOO for the cost of the renovations.  GOO paid Tejas Interior Renovations, Inc. $12,755.10 for its work on the renovations.  In December 2010, Hines' reimbursement check was deposited into the account of Defendant GEC (an entity solely owned by Tallerine) instead of GOO's account;

(b)     On April 15, 2011, a $35,593.51 check payable to GOO from Pioneer Drilling Services for an overpayment on a turnkey drilling project was deposited into a non-GOO account belonging to Goldking Energy Partners II, LLC, one of the entities owned and controlled by Tallerine;

(c)     On June 14, 2011, a $38,124.90 check payable to GOO from Russo Exploration for its share of a cash call on a GOO-operated property was deposited into Defendant GEC's (an entity solely owned by Tallerine) bank account; and

(d)     On January 30, 2012, a $7,650.00 check payable to GOO from WCA Waste Corporation was endorsed over to, and deposited in the account of, Defendant GEC.

**C.**   **Tallerine Deposited GOO Checks Made Payable to Vendors In His Personal Accounts**

32.     Tallerine, with Ramsey's assistance, also took GOO checks made payable to third-party vendors used by GOO, and intentionally deposited them into accounts owned by Tallerine's personal, non-GOO related entities.

33.     Specifically, in late May 2011, GOO prepared three checks totaling $234,767.28, two of which were payable to Phoenix Exploration ($59,805.74 and $57,921.69) and one of which was payable to Pioneer Drilling Services ($117,039.85), two actual vendors that performed work for GOO.  At that time, Tallerine approved all GOO disbursement checks prior to mailing, and he had possession of them in his GOO office.  Tallerine brought the three checks back to GOO's accounting staff, and informed them that they were not to be paid and that the checks were to be voided.  Shortly thereafter, when GOO's operating account was overdrawn, GOO employees discovered that the three "voided" vendor checks had cleared GOO's account and had been deposited into the account of Defendant Goldking Energy Partners I, LP, an entity owned and controlled by Tallerine.  The Pioneer Drilling Services check was deposited on May 23, 2011, and the Phoenix Exploration checks a few days later on May 25, 2011.  Tallerine and Ramsey had diverted these funds into Goldking Energy Partners' account by using a check scanning device that allowed them to deposit the funds into the incorrect account without interference by GOO's bank.  GOO was forced to subsequently pay these vendors for the (still) outstanding amounts.

34.     On June 3, 2011, a $15,811.50 GOO check payable to Charter Capital was held by Tallerine and then deposited into the account of Defendant Goldking Capital Management, LLC (another entity owned and controlled by Tallerine).  As a result of this misappropriation, GOO had to submit a replacement check to Charter Capital.

13

**D.** **Tallerine's Diversion of GOO's Cash to Pay Personal Expenses or Support Personal Investments**

35.     Tallerine, with the assistance of Ramsey, diverted GOO's cash into his personal accounts and directed that GOO's cash be used to pay his personal expenses or support his personal investments. For example:

(a)     On April 14, 2011, Tallerine and/or Ramsey caused $100,000 to be wired from GOO's operating account to the account of Defendant GEC, an entity owned by Tallerine, with no explanation or documentation supporting such a transfer of funds. Upon information and belief, the transfer was related to an acquisition—Hemus—that Tallerine was considering. While $100,000 was returned to GOO in late October, GEC did not pay interest for the unauthorized and unapproved loan;

(b)     On April 28, 2011, Tallerine and/or Ramsey directed $8,064.63 to be paid out of GOO's operating account to Ponce Services for the demolition of a house in the Heights in Houston that, upon information and belief, is (or was at the time) owned by Tallerine or one of his affiliates;

(c)     On May 31, 2011, Tallerine and/or Ramsey caused $23,800.00 to be wired from GOO's account to the account owned by Tallerine and his wife, with no explanation or documentation supporting such transfer before it was made;

(d)     In June 2011, Tallerine and/or Ramsey caused $101,000 of GOO's cash to be used to pay two vendors for the construction and design of a blow-dry bar owned by Tallerine's daughter, with indisputable knowledge aforethought that such expenses had nothing to do with GOO's business.  Specifically, GOO paid $28,255.11 to Jackson Ryan Architects on June 6, 2011, and $73,228.32 to Tejas Interiors on June 13, 2011;

(e)     On June 6, 2011, Tallerine and/or Ramsey directed that $6,474.75 be paid out of GOO's operating account to Robert Longoria Painting, for painting services performed at Tallerine's residence;

(f)     On June 16, 2011, Tallerine and/or Ramsey ordered a $24,967.90 wire from GOO's operating account to Gulfstream Aerospace.  Upon information and belief, this payment relates to an aircraft owned by Tallerine through his entity Defendant GEC;

(g)     On June 17, 2011, Tallerine and/or Ramsey caused $43,000 to be wired from GOO's bank account to Tallerine's personal bank account, with no explanation or documentation supporting such a transfer of funds.  Upon information and belief, the transfer was made because Tallerine's personal bank account was overdrawn by $43,000;

(h)     In August 2011, Tallerine and/or Ramsey caused GOO to pay an invoice submitted by SMBology, which included over $533 for IT services provided to Tallerine's wife, not GOO;

(i)     Tallerine and/or Ramsey caused GOO to pay at least two vendors (Lacey Construction and Chrestia Staub Pierce) for work relating to the identification and renovation of buildings in New Orleans.   GOO's Board of Managers had informed Tallerine that GOO had no interest in opening up a satellite office in New Orleans.  Despite this unequivocal "no," Tallerine arranged for GOO to pay Lacey Construction $2,983.24 for New Orleans property due diligence, and Chrestia Staub Pierce $10,305.10 for architect and designer services anyway;

(j)     In 2012, Tallerine and/or Ramsey caused GOO to pay the following expenses, that, upon information and belief, relate to Tallerine's personal life and/or personal businesses, not GOO business:

| Payee | Description | Amount |
|---|---|---|
| New Orleans Business Council | Non-GOO related dues and memberships | $14,000.00 |
| Busycon Properties (rent) | Two Shell Plaza Lease for suites 2500A, 2510 and 2535; used by Tallerine's personal business entities | $40,658.64 |
| Baker & Hostetler | Non-GOO related legal fees | $9,839.50 |
| Netherland Sewell & Associates | Vaquillias Ranch Field | $11,033.65 |
| Harold J. Anderson | Non-GOO related properties | $7,573.46 |
| GEC expense reimbursement | Expense reimbursement to GEC for its pension and profit sharing | $6,325.00 |

(k)     On September 5, 2012, well after Tallerine attempted to explain to GOO's accounting staff that all of his misconduct was simply accounting "mistakes," Tallerine directed that a $32,200 wire be made from GOO's operating account to a law firm in Louisiana, which later was discovered to have been for the purpose of funding a DIP loan related to a restaurant in New Orleans, which Tallerine used and parlayed as a position of advantage in the bankruptcy court sale process to acquire the restaurant out of the chapter 11 case, even beating out other competitive bids.  Although the principal of the "loan" was returned when the DIP loan was repaid in November, Tallerine kept the loan commitment fee, loan administration fee, and interest, totaling $6,772.80; and

(l)     Tallerine received a number of improper "travel" or "expense" advances (totaling at least $53,700.00) that were not approved by GOO's Board of Managers per Tallerine's employment letter agreement and were made in violation of GOO's corporate expense reimbursement policy.  Tallerine also failed to submit expense reports after the travel to "true up" or offset actual expenses against the advance.

15

Tallerine took at least the following improper advances, the timing and amount of which establish that the cash was not intended to be used to offset legitimate GOO-related travel expenses:

- 5/23/11 - $ 3,500.00
- 6/03/11 - $ 1,200.00
- 8/26/11 - $12,500.00
- 8/31/11 - $10,000.00
- 9/07/11 - $12,500.00
- 10/11/11 - $10,000.00
- 2/23/12 - $   500.00
- 6/29/12 - $   500.00
- 7/18/12 - $   500.00
- 7/25/12 - $   500.00
- 8/23/12 - $   500.00
- 9/25/12 - $   500.00
- 10/01/12 - $   500.00
- 11/01/12 - $   500.00

E.     **Tallerine's Flagrant Misuse of Expense Reports**

36.     Tallerine flagrantly misused expense reports to pay for even more of his personal expenses and to cover up his conversion of GOO's funds.  Tallerine submitted expense reports both for himself and on behalf of Defendant GEC.   Some expense reports requested reimbursement checks.   Others—submitted primarily in late 2011 after Tallerine's long-term misappropriation of company funds had been uncovered by GOO staff (but not yet disclosed to Wayzata or the GOO Board of Managers)—were submitted to "offset" the amount of money Tallerine and his entities owed GOO for stealing GOO's cash.

37.     The vast majority of these expense reports failed to follow the terms of Tallerine's employment letter, as well as GOO's corporate expense reimbursement policies.  For example, Tallerine rarely submitted his expense reports in a timely manner—at times submitting expense reports for expenses purportedly incurred over a year before—and the reports lacked sufficient explanation to support the business reason for the charges.   More egregiously, Tallerine's expense reports were often approved only by Tallerine himself, a clear violation of his

16

employment letter, which required the approval of designated Board of Managers appointee Mike Strain before payment. Plaintiffs' preliminary analysis of Tallerine and GEC's expense reports indicates that Tallerine and/or GEC received at least $140,000.00 in expense reimbursements that were not approved by Mr. Strain per corporate policy.

38.     Plaintiffs' analysis of Tallerine's expense reports also—perhaps unsurprisingly at this point—uncovered many instances of improper reimbursement for non-GOO related expenses, including charges at Mercedes-Benz dealerships, Sirius XM subscriptions, Astros tickets, parking fines, and almost $10,000 in fuel charges in and around Houston. Plaintiffs' preliminary analysis indicates that Tallerine and/or GEC received at least $76,000.00 in expense reimbursements for expenses that do not appear to be related to GOO, or that are too insufficiently documented to tell (in violation of GOO policy).

**F.      Ramsey and Culotta's Participation in Tallerine's Scheme to Defraud**

39.     Ramsey, who was GOO's Vice President and Assistant Treasurer, actively participated in Tallerine's scheme to embezzle from and defraud GOO and GKH. Ramsey, among other things, (i) diverted GOO funds to Tallerine's personal bank account and accounts of entities owned by Tallerine; (ii) directed GOO to pay personal expenses on behalf of herself and Tallerine; (iii) falsified vendor invoices submitted to GOO for payment; (iv) submitted invoices to GOO for payment to bogus vendors for services not rendered; (v) deposited checks payable to GOO in accounts of entities owned by Tallerine; and (vi) deposited GOO checks made payable to GOO vendors in accounts of entities owned by Tallerine. Ramsey also participated in the attempt to "cover up" Tallerine's fleecing of the company by doctoring invoices and altering the company's books and records.

40.     Culotta was GOO's Senior Vice President Corporate Planning, Budget and Analysis until December 2011.  Because the embezzlement scheme was pervasive and material amounts of cash were routinely stolen from GOO, Culotta either knew, or at the very least should have known, of Tallerine and Ramsey's illegal conduct.  Culotta did nothing to stop their wrongdoing or disclose its existence to GOO, GKH, or GKH's Board.  Moreover, once Culotta became aware of Tallerine and Ramsey's gross misappropriation of GOO's money, he did not disclose that information to GOO, GKH or GKH's Board.

41.     Culotta continued to be involved in this scheme after his termination, when he was hired by Plaintiffs as a consultant.  Culotta acted in this role at the express requirement of Tallerine, who requested that GOO's replacement CFO, Eddie Hebert, draft a "work plan" for Culotta for Tallerine's review.

42.     In his "consultant" role, Culotta, at Tallerine's direction, assumed oversight of the Plaintiffs' 2011 audit, working closely with the accounting staff he had previously overseen. Culotta worked actively to conceal Tallerine's pattern of fraud and stolen funds throughout 2011 (of which he was aware) so that GOO's auditor (Hein & Associates), Wayzata, and GKH's Board of Managers did not learn of the wrongdoing.  Culotta was tasked with making certain that the 2011 audit to be issued in 2012 did not reveal any of Tallerine's improper transactions to Hein & Associates, Hebert, Wayzata, or other members of the Board of Managers.  Culotta's manipulations were highly successful for Tallerine: the auditors remained ignorant, the Tallerine thefts never were flagged, and Plaintiffs received a clean audit.

**G.    Tallerine, Culotta and Ramsey's Conduct Violated Plaintiffs' Code of Conduct and Ethics**

43.    Goldking Holdings, LLC has a Code of Conduct and Ethics dated August 16, 2010.  Tallerine, Culotta, and Ramsey violated the Code of Conduct and Ethics in a number of ways starting from their very first days at the company.

44.    Tallerine's personal use of Plaintiffs' assets violated at least the following four provisions of the Code of Conduct and Ethics:

2.   Loans to Directors, Officers and Employees:  The Company is prohibited from, directly or indirectly, making any loan to a Director, officer, or employee of the Company or guaranteeing any loan or obligation on behalf of a Director, officer or employee, except in connection with the relocation of an employee.

5.  Corporate Opportunities: . . . It is the Company's policy that Directors, officers and employees shall be prohibited from . . . using corporate property, information or position for personal gain . . . .

7.   Fair Dealing:  Each employee should endeavor to deal fairly with the Company's joint interest owners. . . . No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice.

8.  Protection and Proper Use of Company Assets:  All employees should protect the Company's assets and ensure their efficient use . . . . All Company assets should be used for legitimate business purposes.

45.    In addition, Tallerine, Culotta, and Ramsey violated, and likely caused other employees to violate, various other corporate policies and procedures, including those related to accounting for cash receipts, vendor invoices, and the cash disbursement process.  These actions also violated the Code of Conduct and Ethics provision regarding Fair Dealing, which states in relevant part:

7.   Fair Dealing:  Each employee should endeavor to deal fairly with the Company's . . . employees.  No employee should take unfair advantage of anyone through   manipulation,   concealment,   abuse   of   privileged   information, misrepresentation of material facts, or any other unfair-dealing practice.

46.     Tallerine, Culotta and Ramsey's failure to immediately report these actions to the Board of Managers when first discovered constitutes a violation of the Code of Conduct and Ethics provision regarding reporting obligations:

> 3.  The Company Encourages the Reporting of Illegal or Unethical Behavior:  . . . In addition, employees should report any violations of law, rules, regulations or its Code of Conduct and Ethics to appropriate personnel. . . .

## H.     The Wide Reaching Effects of Tallerine and the Defendants' Conduct

47.     Tallerine's diversion of Plaintiffs' funds, personnel, and resources directly harmed Plaintiffs' financial condition by causing shortfalls in GOO's operating cash and negative cash balances in its operating bank account at a critical time in its development and operation.   Tallerine's poor business choices—made while diverting company funds for his personal affairs—diverted focus from Plaintiffs' core business by critical personnel, including Tallerine himself.  Tallerine instilled a culture of disregard for conducting business with integrity by installing key allies into positions where they could help him steal and self-deal, and then cover it up.  Moreover, Tallerine's elaborate embezzlement scheme—which, as set forth below, Plaintiffs have now discovered paralleled what he employed in connection with several prior businesses—supports the presumption that Tallerine made decisions with respect to drilling, operations, and the deployment of capital in such a manner that would allow him to continue to skim and steal money from Plaintiffs under cover of, or in tandem with, seemingly legitimate transactions.   In effect, Tallerine needed financial activity and expenses going out so that he could use his position of control to have access to cash flow coupled with the opportunity to "cover up" his misappropriation of company money to fund his personal investments and lifestyle.

48.     The impact of Tallerine's actions was not completely evident until long after the fraud occurred—in part due to the central role Tallerine, Culotta and Ramsey had in making sure the financial irregularities were not discovered by others in the company or by outside auditors. However, with the fraud now discovered, a picture has developed as to how Defendants' pattern of irresponsible and fraudulent conduct truly impacted Plaintiffs over time.  Tallerine's use of Plaintiffs' resources for his own agenda, both personal and for his separately-owned businesses (which also helped him cure or defer his unrelated personal financial setbacks), constituted a pattern of fiduciary breaches that caused substantial injury to Plaintiffs and materially contributed to their bankruptcy.  Tallerine represented himself as an experienced and skillful oil and gas operator and developer; yet Plaintiffs' business failed while Tallerine spent his time using Plaintiffs' resources to fund personal activities and personal business ventures.

49.     Plaintiffs' first extensive exploration and drilling activities were undertaken in the White Oak properties purchased in late 2010.  These efforts, which were pushed forward in the first quarter of 2011, failed miserably, and are best characterized as a waste of resources. Plaintiffs incurred significant exploratory and drilling costs by drilling three wells on the White Oak properties that did not generate any meaningful return.  What they did provide, however, were opportunities for Tallerine to use the multitude of accounting transactions which emanated from this ill-fated drilling program to raid Plaintiffs' coffers for his personal benefit.

50.     As shown above, Defendants' fraud against Plaintiffs intensified in 2011, as Plaintiffs' exploration efforts apparently coincided with Tallerine's personal need for cash to use elsewhere.  Over a short period, Tallerine expended GOO's cash and working capital by directing or authorizing its use for non-GOO expenditures including payments that benefited himself, certain of his family members and entities he owns.  Tallerine's personal use of GOO's

cash compromised GOO's financial condition, causing a shortfall in GOO's operating cash or a negative cash balance in its operating bank account in June 2011. While Plaintiffs under Tallerine induced Wayzata to contribute significant amounts of capital to fund the White Oak drilling operations and to also undertake another asset purchase from EOG Reserves known as the "Nine Mile Properties," Tallerine continued to use the activity associated with these seemingly legitimate transactions to have transfers and deposits made which lined his own pockets.

51.     Shortly after the negative impact of his actions were brought to the attention of Culotta, then the Senior Vice President of Corporate Planning, Budget and Analysis, (but again, not to GKH's Board of Managers or Wayzata), some cash appears to have been returned by Tallerine in late June 2011 and then again in December 2011. But the damage was done, and his return of cash was not a full reimbursement of what had been taken, nor was any accounting provided reflecting what Tallerine had used Plaintiffs' money for, nor was the Plaintiffs' Board of Managers informed.

52.     By the fall of 2012, Plaintiffs' business problems manifested in its secured lender, Bank of America ("BOA"), declaring Plaintiffs in default of their Credit Agreement. Incredibly, it was at this time that Tallerine used $32,200 of GOO's cash to fund the DIP loan associated with a New Orleans restaurant that he later purchased out of a bankruptcy proceeding. In executing this fraud on the company, Tallerine abused his position of authority and trust by lying to GOO's CFO Hebert, telling him face-to-face that the wire (which was to be directed to the trust fund of a law firm who did legal work for Tallerine's personal businesses but also represented Plaintiffs) was needed to pay company lawyers for company business.

53.     Separately and also during this timeframe, to forestall foreclosure and associated costs, Wayzata negotiated with BOA while seeking solutions for the default.   Ultimately, Wayzata later funded the purchase of the BOA debt at par for more than $11 million.   Tallerine was asked to purchase his ratable share of the BOA debt alongside Wayzata, but refused.   He also refused to honor a November 2012 capital call to members that he approved as a member of the Board (Wayzata honored the capital call).   This—along with the discovery of Tallerine and the other Defendants' extensive wrongdoing in December 2012—exacerbated the impact and losses and triggered the resulting expenditure of considerable sums for investigative forensic accounting and legal services.

54.     In total, by summer 2013, Plaintiffs had invested more than $70 million in debt and equity financing for the acquisition, operation and unsuccessful development of the White Oak and Nine Mile properties, the refinancing of the BOA debt, and the efforts to discover and take action on the fraud.   In turn, this contributed to Plaintiffs' defaulting on payment of current account creditors, generating still more in losses.   It undercut any ability to obtain capital to develop the oil and gas properties.   Ultimately, Plaintiffs had to commence the Chapter 11 cases in order to obtain much needed liquidity and to preserve and maximize value through the attempted sale of all or substantially all of their assets.

55.     The sale process that resulted confirmed the magnitude of the harm.   Despite being professionally implemented and managed by a qualified and independent investment banking and asset disposition firm, the sales process failed to generate any meaningful offers commensurate with the proved producing reserves, much less the more than $70 million sunk cost in the properties.

56.     Tallerine's actions, whether by theft or grossly erroneous choices, have ultimately resulted in the ruination of Plaintiffs' business, whereby properties acquired and developed at a cost of over $70 million dollars in capital and debt are now valued at only a pittance, as confirmed after a robust sales process that documents a diminished market value.

I.     **Tallerine's Post-Termination Wrongful Conduct and Bad Faith**

57.      As stated above, Tallerine's unlawful scheme was discovered by GOO, GKH, GKH's Board and Wayzata and promptly examined and acted upon in December 2012.   On December 17, Tallerine was terminated as CEO and President of GOO and GKH.   Ramsey's employment was terminated two days later.

58.     On February 13, 2013, the date this action was originally filed, Wayzata exercised its contractual right to remove Tallerine as the Minority Manager on GKH's Board.   Section 6.3 of GKH's Amended and Restated Limited Liability Company Agreement provides Wayzata, GKH's majority investor, with the right to remove the Manager appointed by minority member LT Capital for cause.   Tallerine was LT Capital's appointed Minority Manager.   Following a removal of a Manager for cause, the GKH LLC Agreement allows the Minority Investor to replace the removed Manager.   Wayzata notified Tallerine that he was removed, for cause, from his position as Manager because GKH and Wayzata's ongoing investigation had revealed extensive unlawful conduct that had harmed both GOO and GKH.

59.     In response, Tallerine immediately attempted to "reappoint" himself as the replacement Manager on behalf of LT Capital.   In an abundance of caution, Wayzata notified Tallerine that it was again exercising its right to remove him as Manager for cause, and that it would continue to exercise that same right to the extent he attempted to reappoint himself in the future.   Wayzata also explained that LT Capital was free to name a different replacement

Manager.  When Tallerine refused to appoint someone other than himself as replacement Manager, Wayzata stated again that Tallerine had been removed for cause based on the conduct outlined in this lawsuit, he was no longer a Manager of GKH, and he had no authority to speak or act on behalf of the company or its subsidiaries.

60.     After being removed as Manager, Tallerine represented to third parties that he continued to serve as a Manager on GKH's Board and used that false stamp of authority to attempt to obtain confidential company information.  For example, GKH was notified that Tallerine contacted Parkman Whaling—a company providing valuation services to GKH at the time—over a week after he was removed, and represented himself to be a "Manager and Director" of GKH.  Tallerine also demanded, among other things, that Parking Whaling immediately provide him with a copy of work it had done or was doing for GKH and all materials that were provided to Parking Whaling by GKH.  GKH responded to this improper and unauthorized communication by letter to Tallerine's counsel, requesting confirmation that Tallerine would "immediately cease and desist representing to third parties that he is a Manager and/or Director of GKH or that he holds any executive position at GKH or GOO."  Tallerine's counsel responded by repeating Tallerine's erroneous view that Tallerine was allowed to "reappoint" himself as Manager after being removed from the position for cause, and by asserting, unequivocally, that Tallerine "is currently a manager/director" of GKH.

61.     Tallerine's refusal to accept that he has been removed as Manager of GKH and his representations to third parties that he remains a Manager are extremely harmful to GOO and GKH's reputation and goodwill.  Given the severity of Tallerine's misconduct and the allegations contained in this action, it is detrimental for members of the industry to believe that Wayzata and GKH would allow Tallerine to remain in a position of trust and responsibility at

GKH.  Moreover, GKH is at risk of Tallerine using his bogus title to obtain sensitive company information to which he has no immediate right as a minority member of the company.

62.     In addition to the above, Tallerine has harassed GOO employees and GKH Board members with numerous requests for information and access to employees far in excess of what is reasonable for an investor.  Although Tallerine and his affiliates removed scores of boxes of records, documents, computers and other affects from GOO premises after his termination, Tallerine continued to issue improper requests and to badger Board members (and Wayzata) in an attempt to fabricate a record of being "oppressed" as the minority member of GKH.

## J.     **Defendants' Embezzlement and Theft Was No "Mistake" or "Accident"**

63.     Any claim by Tallerine, Culotta, Ramsey, or any of the other Defendants that the above-outlined instances of misappropriation, embezzlement, and theft were innocent "mistakes" or "accidents" is belied by the fact that Tallerine has an extensive background and practice of looting the businesses that he was entrusted to operate in order to pay his personal expenses and pad his personal bank account and the bank accounts of his separately owned entities.

64.     As Plaintiffs' and Wayzata's initial investigation has revealed, Tallerine orchestrated schemes—with the help of Ramsey (who he would later hire to work for him at GOO) to embezzle and defraud at least two companies he had been involved with before GKH and GOO.  Several involved ECP, for which Tallerine and his entity Defendant GCM served as Chief Restructuring Officer ("CRO") in connection with its bankruptcy filing in the Western District of Louisiana.  As CRO, Tallerine had access to ECP's accounts and the ability to authorize the payment of invoices and fees and the transfer of cash.  Upon information and belief, Tallerine frequently caused ECP to make advances to or for the benefit of himself and his controlled entities out of ECP's accounts that were never disclosed to or approved by the

Louisiana Bankruptcy Court.  Stated another way, Tallerine and GCM used the ECP estate's property as a free (and unlimited) line of credit.  Upon information and belief, Tallerine caused ECP to make approximately $2.8 million in payments to GCM, while the total Bankruptcy Court approved fees and expenses totaled only $1.6 million.  Upon information and belief, of the roughly $1.2 million difference, GCM only repaid approximately $870,000, while roughly $173,000 in unapproved funds were paid to GCM and never paid back.

65.    While CRO of ECP, Tallerine also altered invoices for personal expenses, turned them into fictitious invoices for business expenses of ECP, and authorized such false invoices to be paid by ECP.  Upon information and belief, Tallerine caused ECP to pay two invoices in the amount of $44,543.71 and $55,408.56 to Lacey Construction, a home remodeling contractor in New Orleans, for construction services performed on his home.   The monthly operating reports to the Bankruptcy Court altered the name of Lacey Construction to code it as a vendor called "R. Lacey" or "Lacey Co."  Tallerine and/or Ramsey also doctored at least one Lacey Construction invoice to appear that it was for work done on behalf of ECP.

66.    Upon information and belief, Tallerine also caused ECP to pay $22,625 to a Houston-based interior designer, Mary Ann Smith, who transacts business under the trade name "Tejas Interiors."   ECP's November 2009 Monthly Operating Report, which was signed by Tallerine under penalty of perjury, codes Tejas Interiors as "Tejas Consulting," a provider of "Engineering Services," and Tallerine caused ECP to issue a check payable to "Tejas Consulting."  However, the deposit slip for the check plainly reveals that "Mary Ann Smith dba Tejas Interiors" is the actual recipient of the check.

67.    Upon information and belief, Tallerine also submitted at least $23,000 in false invoices to ECP for work purportedly (but not actually) done by Defendant Vermillion, which—

as explained above—is a sham entity owned by one of Tallerine's ex-wives and controlled by Tallerine and Ramsey.

68.     Tallerine continued his wrongdoing when ECP's assets were purchased out of bankruptcy by EC Offshore Properties, Inc. ("ECOP").  Upon information and belief, Tallerine established a scheme through another subcontractor, Island Operating Co., Inc. ("Island Operating"), whereby Island Operating would include in its invoices to ECOP a monthly $10,000 charge in the name of one of Tallerine's employees.  That $10,000 was paid out of ECOP to Island Operating, who then forwarded the funds to the employee.  That employee would then—each month—deposit the check in his personal account and then transfer the entire $10,000 to Ramsey.

69.     Tallerine engaged in similar conduct during his time as CEO and President of Goldking Operating Company, an entity that was sold to Dune Energy in 2007.  Upon information and belief, following the sale, the former majority owner of Goldking Operating Company uncovered over $300,000 in improper transfers of corporate funds to Tallerine's personal accounts and use of corporate funds to pay for or reimburse Tallerine's personal expenses.  For example, the former owner alleged that: (i) Tallerine directed a $98,000 wire be made to his personal account that was not earned compensation; (ii) Tallerine had the company purchase a $60,000 life insurance policy for Tallerine and his wife without proper approval; (iii) Tallerine was improperly reimbursed for over $80,000 in expenses relating to his private jet; (iv) over $50,000 of Tallerine's personal expenses were either paid by the company or were improperly reimbursed, including charges for personal clothing, Tallerine's personal tailor, Tallerine's personal trainer and Tallerine's Astros tickets; (v) Tallerine gave Ramsey an

unauthorized $18,000 bonus; and (vi) Tallerine used company funds to pay for his daughter's BMW lease.

70.     In addition to discovering Tallerine's extensive history of fraud and theft before GOO and GKH, Plaintiffs have learned that he continues this pattern of misconduct to this day. Upon information and belief, Tallerine continues to steal from entities in which he is still involved and to fraudulently endorse checks over to himself or his entities.  Tallerine's gross misappropriation and outright theft of Plaintiffs' funds was no "mistake."  Tallerine intentionally steals whenever and wherever he can.

**K.     Tallerine Acquired Undisclosed Interests in Restricted Investments in Breach of his Fiduciary Duties**

71.     In addition to using Plaintiffs' accounts as his personal piggy bank, upon information and belief, Tallerine also violated GKH's LLC Agreement by failing to fully and candidly disclose his multiple ties to White Oak Energy, the entity which sold the initial properties in the White Oak transaction to Plaintiffs in August 2010.  Upon information and belief, Tallerine acquired an undisclosed interest in White Oak Energy V Royalty, LLC soon after closing the White Oak transaction for Plaintiffs, without disclosure to or the approval of GKH's Board of Managers.  Upon further information and belief, Tallerine also acquired an interest in White Oak Energy VI, LLC, without disclosure to or approval of GKH's Board of Managers.  Because these investments constitute "Restricted Opportunities" under the terms of the GKH LLC Agreement, Tallerine's secret acquisitions of these interests violate Section 6.10 of the LLC Agreement and constitute additional breaches of Tallerine's fiduciary duties.

## Allegations Relating to Claimants' Proofs of Claim

**L.      Debtors' Capital and Debt Structure**

72.      Soon after formation, the Debtors closed on the purchase of oil and gas properties from White Oak Energy, LLC ("WOE"), paying about $41 million (the "White Oak Transaction").  Most of the capital needed came from Wayzata.

73.      As part of its operations and to facilitate the development of oil and gas properties to be acquired, the Debtors arranged initial financing through capital contributions (sourced mostly from Wayzata), and the implementation of bank financing by and through BOA.  Prior to the commencement of the Chapter 11 Cases, the Debtors entered into that certain Credit Agreement, dated November 5, 2010, by and among the Debtors, the financial institutions named therein, as banks, BOA, as administrative agent and issuing bank, and Banc of America Securities LLC, as lead arranger and book manager (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, (the "Existing Credit Agreement"), a copy of which is filed with the Court).  Prior to the Petition Date, BOA made loans, advances and provided other financial accommodations to Borrower pursuant to the terms and conditions set forth in (1) the Existing Credit Agreement, and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of BOA (and, by virtue of the Assignment, Wayzata), including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto, as assigned by BOA to Wayzata pursuant to the Assignment (all of the foregoing, together with the Existing Credit Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated

and/or replaced at any time prior to the Petition Date, collectively, the "Existing Credit Documents").

74.     Pursuant to the Assignment and Acceptance (the "Assignment and Acceptance"), the Resignation, Assignment and Release Agreement (the "Resignation"), and the Release Agreement (the "Release," and together with the Assignment and Acceptance and the Resignation, each as amended, modified or supplemented from time to time, collectively the "Assignment"), each dated as of January 24, 2013, by and among the Debtors, BOA, and Agent (referred to hereinafter as the "Lender"), BOA assigned, sold and delegated all of its rights and obligations under the Existing Credit Agreement to Wayzata following a declared default that occurred.  The Assignment was a valid, binding and enforceable assignment of the Existing Credit Agreement's rights and obligations from BOA to Wayzata.

75.     As of the Petition Date, the aggregate judicially determined amount of all obligations owing by the Debtors to Wayzata under and in connection with the Existing Credit Documents was not less than $11,582,729.51, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, and as such term is more fully defined in the Ratification Agreement, the "Pre-Petition Obligations").

76.     The Pre-Petition Obligations, which have previously been found and determined to be fully secured and perfected by enforceable liens and security interests, constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors.  By prior Court order, they shall not be subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and the Debtors do not possess and shall not assert any claim, counterclaim, setoff or defense of

any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

77.    Also, by prior order of the Court, the Debtors have also been authorized and empowered to borrow, obtain and incur post-Petition indebtedness and obligations from Wayzata pursuant to the terms and conditions of the Permanent Financing Order, the Existing Credit Agreement (as such term is more fully defined in the Ratification Agreement), as ratified and amended by the Ratification Agreement (the "Credit Agreement,"), and the other Existing Credit Documents (as such term is more fully defined in the Ratification Agreement), as ratified and amended by the Ratification Agreement (the "Credit Documents,"), in such amounts as may be made available to Borrower by Lender in accordance with the Budget.  Subject to the terms and conditions contained in this Permanent Financing Order and the Credit Documents, including Section 5.2 of the Ratification Agreement, Debtors use the proceeds of the Loans and any other credit accommodations provided to or for the benefit of Debtors pursuant to this Permanent Financing Order, the Credit Agreement or the other Credit Documents for, inter alia, the payment of employee salaries, payroll, taxes, and all other expenses specified in the Budget for other operating and working capital purposes, including, without limitation, the Hedging Obligations (including any amounts for the Hedging Obligations related to the period prior to the Petition Date), in the ordinary course of Debtors' business in accordance with the Credit Documents, including the fees of the U.S. Trustee, the Clerk of this Court and, subject to Section 2.3 of this Permanent Financing Order, Allowed Professional Fees (as defined in the Permanent Financing Order).   At this time, these include aggregate advances total over $13 million, inclusive of the Pre-Petition Obligations.

78.     The Debtors also have obligations associated with its operation of the oil and gas properties and as a result of litigation efforts commenced pre-bankruptcy to address the issues caused by Tallerine and others' activities.  These other obligations include claims by ad valorem taxing and other governmental entities, and to unsecured creditors providing goods and services to the Debtors.  There are approximately $2 million in other claims, though another more than $10 million in disputed claims above this amount have been filed in the bankruptcy case.

79.     The Debtors also have obligations associated with the investigation, prosecution and administration of the litigation issues arising from the disputes with Tallerine as well as the issues in the Chapter 11 Cases.  This also includes indemnity claims.  There are also allowed priority claims relating to employees under retention programs.

## M.     The Tallerine Claim

80.     The Tallerine Claims includes amounts alleged to be due as follows: (i) $555,070.41 in pre-Petition litigation expenses payable to the Fryar Law Firm, P.C., relating to the Fryar Law Firm, P.C.'s representation of Tallerine and others with respect to the claims Tallerine and his affiliates have asserted against the Debtors and others, as well as the claims asserted against Tallerine by the Debtors in this action; (ii) $5,266.31 alleged by Tallerine to be his reimbursement of payments made by Tracy Santoro ("Santoro"), a former employee, for company expenses incurred by her while Tallerine was still CEO; and (iii) claims asserted by Tallerine that are now represented by that certain Answer to First Amended Complaint and Amended Counterclaim dated May 19, 2014 ("Tallerine Amended Counterclaim").

## N.     The GEC Claim

81.     The GEC Claim against GOO (which is signed by Tallerine) seeks payment of $57,728.33 for "charter flight charges" for GOO's alleged use of GEC's Hawker jet.  Cited are 6

33

flights between New Orleans ("NOLA") and Houston in September 2012 (two of which are apparently "repositioning" flights for Tallerine's presumed convenience); eight flights in October 2012; eight more flights in November 2012 between NOLA and Houston (two more of which are for "repositioning"); and two flights in December 2012, which are dated after Tallerine's termination, and one of which purports to seek payment for two of Debtors' executives that Tallerine left behind when returning from the meeting with Wayzata where Tallerine was terminated for cause as CEO of the Debtors.

**O.      The Culotta Claim**

82.      The Culotta Claim for $16,726.10 is "premised upon" attorneys' fees and costs incurred as a result of GOO's alleged breach of a Separation Agreement confirming Culotta's departure from Debtors in December 2011.  The claim consists of fees and expenses billed by Culotta's present employer, the Fryar Law Firm, P.C., the law firm representing Tallerine, GEC, and Culotta in this action.  Culotta was the former Senior Vice President Corporate Planning, Budget and Analysis for GOO, has worked closely with Tallerine, and has assisted Tallerine in his other unrelated business ventures and activities, including those undertaken while each was an officer and fiduciary to the Debtors.  Notably, the claims Debtors assert against Culotta that form the basis for his Separation Agreement claim are not based upon his conduct while he was an officer of GOO.  The claims against Culotta stem from his actions after the date of his Separation Agreement, when he served as a consultant to the Debtors.  In 2012, Culotta took active steps to manipulate Debtors' accounting records, masking the previously made wrongful transfers of Debtors' assets for the benefit of Tallerine and his interests to prevent discovery by the Debtors' auditors.

## V. CAUSES OF ACTION

**Count 1: Conversion against Tallerine, GEC, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

83.     All prior allegations are incorporated herein by reference.

84.     GOO owned, possessed, or had the right to immediate possession of funds contained in its bank accounts, and of incoming checks or other instruments made payable to GOO that were received by GOO representatives.

85.     The funds contained in GOO's bank accounts, and checks or other instruments made payable to GOO, were personal property, identifiable as separate chattels, intended to be kept segregated, constituted an intact fund, and were not subject to a title claim by Defendants.

86.     Defendants wrongfully diverted or withdrew funds from GOO's bank accounts, and wrongfully diverted checks or other instruments made payable to GOO, for Defendants' benefit without GOO's knowledge or consent.  Defendants wrongfully exercised dominion and control over the wrongfully diverted or withdrawn funds and the wrongfully diverted instruments in a manner inconsistent with GOO's rights.

87.     Defendants also used GOO assets and personnel for business and personal activities not related to GOO business activities.

88.     Defendants either participated directly in converting GOO's account funds and incoming payments, or received GOO's account funds and incoming payments with the knowledge that the funds had been wrongfully acquired by another.

89.     Defendants' conduct was willful and constituted bad faith.

90.     Defendants' conduct was not in the best interests of GOO or GKH.

91.     Defendants' conversion has caused GOO substantial injury.

92.     Defendants acted with malice.  GOO is therefore entitled to recover exemplary damages.

**Count 2:  Violations of the Texas Theft Liability Act (Texas Civil Practice & Remedies Code Chapter 134) Against Tallerine, GEC, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

93.     All prior allegations are incorporated herein by reference.

94.     GOO had a possessory right to the funds contained in its bank accounts, and of incoming checks or other instruments made payable to GOO that were received by GOO representatives.

95.     Defendants unlawfully appropriated GOO's bank-account funds and incoming payments by diverting or withdrawing these funds and instruments without GOO's effective consent, in violation of Texas Penal Code § 31.03.

96.     Defendants appropriated GOO's property with the intent to deprive GOO of the property.

97.     Defendants' conduct was willful and constituted bad faith.

98.     Defendants' conduct was not in the best interests of GOO or GKH.

99.     GOO has sustained injury as a result of Defendants' theft.

100.     Defendants acted with malice.  GOO is therefore entitled to recovery exemplary damages.

101.     GOO is entitled to recover its court costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice & Remedies Code § 134.005(b).

**Count 3: Common Law Fraud Against Tallerine and Ramsey**

102.     All prior allegations are incorporated herein by reference.

103.    As explained above, Tallerine and Ramsey made a series of representations to GOO that were material and false, including representations that expenses and invoices submitted to GOO for payment were for expenses incurred in connection with GOO's business.

104.    When Tallerine and Ramsey made these misrepresentations, they knew they were false and/or made the representations recklessly, as positive assertions, and without knowledge of their truth.

105.    Tallerine and Ramsey made these misrepresentations with the intent that GOO would rely and act on them, which it did, to its detriment.

106.    Tallerine and Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

107.    Tallerine and Ramsey's fraudulent conduct caused injury to GOO.

108.    Tallerine and Ramsey committed fraud with malice; therefore GOO is entitled to recover exemplary damages.

### Count 4: Breach of Fiduciary Duty against Tallerine and Ramsey

109.    All prior allegations are incorporated herein by reference.

110.    As the President and CEO of GKH and GOO, as well as a member and manager of GKH, Tallerine owed GKH and GOO a fiduciary duty of loyalty, care, good faith and fair dealing, and candor.  Ramsey owed GOO a fiduciary duty of loyalty, care, good faith and fair dealing and candor because she was the Vice President and Assistant Treasurer of GOO.

111.    Tallerine and Ramsey breached their fiduciary duties to GKH and GOO in numerous respects, by, among other things, (i) embezzling corporate funds for their own benefit; (ii) diverting corporate funds into Tallerine's personal bank account or accounts of entities owned by Tallerine; (iii) causing GOO to pay Tallerine and Ramsey's personal expenses; (iv)

fabricating vendors and invoices and submitting them to GOO for payment; (v) causing GOO to pay false and improper expenses; (vi) stealing checks payable to GOO and depositing them in accounts of entities owned by Tallerine; (vii) stealing GOO checks payable to GOO vendors and depositing them in bank accounts of entities owned by Tallerine; (viii) entering into self dealing transactions with GOO without disclosure or approval; (ix) altering invoices and corporate books and records to disguise their illegal conduct; (x) using GOO assets and personnel for business not related to GOO and for the personal benefit of Tallerine and his affiliated entities; (xi) failing to disclose their knowledge of wrongful and illegal conduct to GOO, GKH or GKH's Board; and (xii) acquiring undisclosed interests in Restricted Investments without disclosure to or approval of the GKH Board of Managers.

112.    Tallerine and Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

113.    Tallerine and Ramsey's breaches of fiduciary duty have caused injury to Plaintiffs.

114.    Tallerine and Ramsey's breaches of fiduciary duty were intentional; therefore Plaintiffs are entitled to exemplary damages.

**Count 5:  Unjust Enrichment against Tallerine, GEC, Goldking Energy Partners I, LP, Goldking Energy Partners II, LLC, Goldking Capital Management, LLC, Reta Wellwood and Ramsey**

115.    All prior allegations are incorporated herein by reference.

116.    Defendants have been unjustly enriched by retaining funds that were illegally and wrongfully taken from GOO by Defendants.  It is unjust for Defendants to retain these funds for which they have no claim or right.

117.    Defendants' unjust enrichment has caused injury to Plaintiffs.

**Count 6:  Breach of Contract against Tallerine**

118.    All prior allegations are incorporated herein by reference.

119.    On or about October 16, 2010, Tallerine entered into an employment letter agreement with GOO and the parties entered into an addendum on or about April 5, 2011 (the agreement and addendum collectively the "Tallerine Employment Agreement").  The Tallerine Employment Agreement required Tallerine to "devote substantially all of [his] business time, attention and best efforts to the affairs of Goldking."  The Tallerine Employment Agreement also specifically listed the limited expense items for which Tallerine would be entitled to reimbursement from GOO, and set forth the procedure by which Tallerine's expense reports were to be approved before payment.

120.    Tallerine breached the Tallerine Employment Agreement by, among other things, not devoting substantially all of his time, attention and best efforts to GOO and GKH business, approving and accepting reimbursement for unauthorized expenses, and not submitting his expense reports for proper approval before directing and accepting payment.

121.    GOO fulfilled all of its duties and obligations under the Tallerine Employment Agreement.

122.    Tallerine's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

123.    Tallerine's breaches of the Tallerine Employment Agreement have caused substantial damage to GOO.

**Count 7:  Breach of Contract against Ramsey**

124.    All prior allegations are incorporated herein by reference.

125.    On or about October 16, 2010, Ramsey entered into an employment letter agreement with GOO (the "Ramsey Employment Agreement").   The Ramsey Employment Agreement required Ramsey to "devote substantially all of [her] business time, attention and best efforts to the affairs of Goldking."   The Ramsey Employment Agreement also stated that she would be reimbursed for "ordinary and necessary business expenses related to directly to [her] employment."

126.    Ramsey breached the Ramsey Employment Agreement by, among other things, not devoting substantially all of her time, attention and best efforts to GOO and GKH business and approving and accepting reimbursement for unauthorized expenses.

127.    GOO fulfilled all of its duties and obligations under the Ramsey Employment Agreement.

128.    Ramsey's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

129.    Ramsey's breaches of the Ramsey Employment Agreement have caused substantial damage to GOO.

**Count 8:  Breach of the Duty of Good Faith and Fair Dealing against Tallerine**

130.    All prior allegations and incorporated herein by reference.

131.    Tallerine, as a Manager who signed the GKH Limited Liability Agreement, owed GKH a duty of good faith and fair dealing.

132.    Tallerine breached his duty of good faith and fair dealing to GKH in numerous respects, by, among other things, (i) embezzling corporate funds for his own benefit; (ii) diverting corporate funds into his personal bank account or accounts of entities he owns: (iii) causing GOO to pay his and Ramsey's personal expenses; (iv) fabricating vendors and invoices

and submitting them to GOO for payment; (v) causing GOO to pay false and improper expenses;
(vi) stealing checks payable to GOO and depositing them in accounts of entities he owns; (vii)
stealing GOO checks payable to GOO vendors and depositing them in bank accounts of entities
he owns; (viii) entering into self-dealing transactions with GOO without disclosure or approval;
(ix) altering invoices and corporate books and records to disguise his illegal conduct; (x) using
GOO assets and personnel for business not related to GOO and for his personal benefit and the
benefit of his affiliated entities; and (xi) failing to disclose his knowledge of wrongful and illegal
conduct to GOO, GKH or GKH's Board.

133.    Tallerine's conduct was willful, constituted bad faith, and was not in the best
interests of GKH.

134.    Tallerine's breaches of the duty of good faith and fair dealing have caused injury
to GKH.

### Count 9:  Aiding and Abetting Breach of Fiduciary Duty and Fraud against Ramsey and Culotta

135.    All prior allegations are incorporated herein by reference.

136.    Ramsey and Culotta aided and abetted Tallerine's breaches of fiduciary duty and
fraud.

137.    As set forth above, Tallerine breached his fiduciary duties to Plaintiffs and
committed fraud against Plaintiffs.  Ramsey and Culotta had knowledge that Tallerine's conduct
was tortious.  Ramsey and Culotta had the intent to assist Tallerine in his tortious conduct.
Ramsey and Culotta gave Tallerine assistance or encouragement in his tortious conduct, and their
conduct was a substantial factor in causing Tallerine's breaches of fiduciary duty and fraud.

138.    In addition, Ramsey and Culotta provided substantial assistance to Tallerine in
accomplishing his breaches of fiduciary duty and fraud against Plaintiffs.  Ramsey and Culotta's

own conduct was a breach of a duty they owed to Plaintiffs (Ramsey as an employee and/or officer of GOO and Culotta as a consultant to GOO), and their participation was a substantial factor in causing Tallerine's breaches of fiduciary duty and fraud.

139.    Ramsey and Culotta's conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

140.    Ramsey and Culotta's actions in aiding and abetting Tallerine's tortious conduct have caused Plaintiffs substantial injury.

### Count 10:  Conspiracy against All Defendants

141.    All prior allegations are incorporated herein by reference.

142.    Defendants engaged in a civil conspiracy to convert substantial amounts of money from GOO and to otherwise defraud Plaintiffs.

143.    Each of the Defendants had knowledge of, agreed to, had a meeting of the minds, and intended to convert GOO's funds and to defraud Plaintiffs.

144.    As set forth above, Defendants committed unlawful, overt acts to further their course of action.

145.    Defendants' conduct was willful, constituted bad faith, and was not in the best interests of GOO or GKH.

146.    The civil conspiracy among Defendants has caused Plaintiffs substantial injury.

147.    The conspiracy was the result of malice.  Plaintiffs are therefore entitled to recover exemplary damages.

### Count 11:  Subordination of the Claims by Tallerine, GEC and Culotta

148.    The Debtors restate the allegations set forth above.

149.    Each of the three Claimants—who also are party Defendants to the causes of action asserted in this Complaint—assert claims that Debtors vigorously dispute on the merits. And, as set forth above, Claimants each engaged in wrongful conduct such that their Claims should be subject to subordination, if not fully disallowed.

150.    The Fifth Circuit in *In re Mobile Steel Co.* articulated the three-prong test for equitable subordination: (1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699-700 (5th Cir. 1977).

151.    As set forth above, each of the Claimants (with GEC also being subject to the domination and control of Tallerine) have engaged in inequitable conduct.  Moreover, the misconduct resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant.  Lastly, there is nothing inconsistent with the other provisions of the Bankruptcy Code to render subordination improper.

152.    Because of Claimants' wrongful conduct described above, the other creditors should not have their rights and recoveries diluted as a result of any claims associated with the Claimants.  To whatever extent the Claims are not fully disallowed on other grounds, subordination is proper.

153.    Tallerine's self-dealing conduct while a fiduciary plainly constitutes inequitable conduct.  The misconduct has given rise to sizable claims; Debtors' business has unquestionably been harmed.

154.    GEC's conduct, and its nexus to Tallerine's misconduct, is similarly inequitable and subjects GEC to subordination.

155.    Culotta's conduct in helping Tallerine avoid detection of Tallerine's self-dealing and improper use of Debtors' assets also constitutes inequitable conduct.  Instead of reporting the thefts and transfers, Culotta hid them.  Then, after Culotta's termination as an officer, he came back to Debtors as a consultant at Tallerine's behest to help cover up the fiduciary mismanagement and misconduct.

156.    Section 510(c) of the Bankruptcy Code provides the following:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).  Allowing any portion of these Claims to dilute recoveries to other creditors would be inconsistent with the Bankruptcy Code.

157.    Pursuant to section 510(c), any remaining allowed amount on account of any of the Claimants' Claims should be subordinated, if not wholly disallowed.

### Count 12:  Fraudulent Transfer – Section 548

158.    All prior allegations are incorporated herein by reference.

159.    The transfers made to or for the benefit of Tallerine and his other wholly-owned businesses were undertaken in fraud of the Debtors.

160.    Section 548(a)(1) of the Bankruptcy Code states:

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)

(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1).

161.   The transfers to Tallerine, personally and to or for his personal and business enterprises, were without consideration to, and in actual fraud of, the Debtors.

162.   The Debtors are entitled to judgment against Tallerine for the transfers made from the Debtors.

163.    Section 550 of the Code imposes liability upon Tallerine or any initial transferee as known or yet to be identified, as well as upon and "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).  The Bankruptcy Code states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).  The Debtors therefore seek recovery against Tallerine for any transfers made in actual fraud of the Debtors, and shall further seek to add and recover any judgment jointly and severally as against any other entity complicit and which has obtained the benefit of a fraudulent transfer in actual fraud of the Debtors.

### Count 13:  Fraudulent Transfer – Section 544

164.    All prior allegations are incorporated herein by reference.

165.    In the further alternative, the Debtors contend that Tallerine's looting of the Company, for his own benefit, the benefit of his wholly owned businesses, and the benefit of his friends and family comprise fraudulent transfers under other applicable law. *See* 11 U.S.C. § 544(b)(1) (providing that a trustee may avoid any obligation or transfer "that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title").

166.    At the time that the monies were taken by or for the benefit of Tallerine and entities he controlled or was personally invested in, the Debtors had one or more creditors (including, without limitation, landlords, taxing authorities and trade creditors) whose claim(s)

arose at the time of the transaction giving rise to the challenged transfers and who have claims against the Debtors' estates as of the date the Chapter 11 Cases were filed.

167.    Bankruptcy Code section 544(b) gives the Debtors, as the estate representative, the power of an unsecured creditor with an allowable claim under applicable state or federal law.

168.    The transfers described above were made in actual fraud of the Debtors, and for which recovery is hereby sought.

169.    The transfers of Debtors' funds and assets by Tallerine, Ramsey and/or Culotta were made at a time when Tallerine, Ramsey and/or Culotta were fiduciaries, and therefore disgorgement and/or recovery of all such transfers of salary and benefits is proper and requested.

170.    Section 550 of the Code imposes liability upon Tallerine or any initial transferee as known or yet to be identified, as well as upon and "any immediate or mediate transferee of such initial transferee."  11 U.S.C. 550(a).  The Bankruptcy Code states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from - (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).  The Debtors therefore seek recovery against Tallerine for any transfers made in actual fraud of the Debtors, and shall further seek to add and recovery judgment jointly and severally as against any other entity or transferee complicit and which has obtained the benefit of a fraudulent transfer in actual fraud of the Debtors.

## Count 14:  Attorneys' Fees

171.    All prior allegations are incorporated herein by reference.

172.    Plaintiffs are entitled to recover costs and reasonable and necessary attorneys' fees from Tallerine and Ramsey pursuant to Section 38.001(8) of the Texas Civil Practice & Remedies Code.

173.    In addition, as a consequence of Defendants' theft, Plaintiffs have found it necessary to employ the undersigned attorneys to pursue this lawsuit.  Accordingly, pursuant to Texas Civil Practices & Remedies Code § 134.005(b), Plaintiffs are entitled to recover from Defendants their court costs and reasonable and necessary attorneys' fees incurred in pursuing this matter.

## VI.  CONDITIONS PRECEDENT

174.    All conditions precedent to Plaintiffs' causes of action have been performed or have occurred.

## VII.  RELIEF REQUESTED AS TO CLAIMANTS' PROOFS OF CLAIM

175.    The Tallerine Claim, the GEC Claim, and the Culotta Claim are each subject to full disallowance, or offset to the extent of damages due the Debtors, or alternatively for any residual claim that was ever allowed, for subordination on the basis of pervasive inequitable conduct for which such relief is proper pursuant to the Bankruptcy Code.

176.    The Debtors respectfully request the entry of an order (i) disallowing the claims filed by Tallerine, GEC and Culotta; and (ii) granting related relief.

### The Tallerine Claim Should be Disallowed

177.    The Tallerine Claim is subject to disallowance and/or offset because of Tallerine's conduct as set forth herein.  Tallerine was President and CEO of the Debtors and on GKH's Board of Managers.  During all relevant times herein, he was a fiduciary of the Debtors. Despite his fiduciary status, Tallerine, among other misconduct described herein, treated Debtors

48

and GOO's accounts in particular, as his personal slush fund, stealing and diverting GOO and

GKH's cash for his personal use and for use in his own, separate personal and business activities.

178.    In addition, the Tallerine Claim includes a duplicative claim for amounts

purportedly advanced by Tallerine to Santoro, a former employee, for putative expenses incurred

in connection with the Debtors' business.  This portion of the Tallerine Claim should be fully

disallowed because there is no basis for the purported "advance" to Santoro.  The Debtors

previously reimbursed Santoro for the same exact expenses that Tallerine claims he separately

paid her for.  The expenses claimed by Tallerine consist of amounts that Santoro has already

received from the Debtors, for which Santoro confirmed her receipt by hand delivery on January

18, 2013 of "Goldking Onshore Operating Check #3772, $2,160.00, matches the amount charged

on my personal credit card for NAPE registrations."  Similarly, the same document reflects that

Santoro accepted other reimbursement checks from Debtors in the amount of $283.58 for her

health club and cell phone, and $3,106.35 for reimbursement of her credit card for the Christmas

luncheon, which Tallerine claims to now own via assignment.  Either Tallerine is making a false

claim for amounts he knows were paid to Santoro by Debtors not Tallerine, or he needlessly paid

amounts to Santoro to acquire a false claim for reimbursement already paid by the Debtors.

179.    Similarly, the claims asserted by Tallerine for "indemnification for attorneys' fees

and costs" should be similarly disallowed because (i) the acts and conduct reflected herein

comprise the type of conduct precluding advancement; (ii) many of the fees and expenses

demanded are expressly excluded from the indemnity and advancement provisions of the GKH

LLC Agreement because they were incurred in connection with proceedings initiated by

Tallerine; (iii) the reasonableness and necessity of the purported fees and costs requested are

open to material objection; and (iv) the advancement sought is subject to disallowance under section 502 and subordination under section 510 of the Bankruptcy Code.

180.    The claims asserted or implicated under Tallerine's stated "reservation" are similarly subject to disallowance and do not state nor comprise a cognizable claim as described therein.

## The GEC Claim Should be Disallowed

181.    The GEC Claim is another documented instance of Tallerine failing to abide by his contractual and fiduciary obligations, and is similarly subject to disallowance.  The terms of Tallerine's employment letter expressly limit airfare reimbursements to GEC for flights to designations such as NOLA, Minneapolis and Houston to the cost of a comparable ticket on a commercial airline, and require prior approval by the company's Board of Directors.  The airfare expenses sought in the GEC Claim meet neither requirement.  Imposing improper, private airfare costs on Debtors when commercial flights were readily available between Houston and either NOLA or Minneapolis was unjustified and grossly excessive.

182.    In addition, the airfare costs GEC seeks to recover were incurred on account of Tallerine's personal business or for personal convenience to Tallerine, not in furtherance of Debtors' business.  It was routine for Tallerine to use his jet for personal needs.   As noted, Tallerine owns homes in both NOLA and Houston, and perhaps elsewhere.  Moreover, costs associated with putative "repositioning" flights are not proper or allowable under the applicable terms of Tallerine's employment letter.

## The Culotta Claim Should be Disallowed

183.    Culotta's claim for costs associated with Debtors' alleged breach of his Separation Agreement is also invalid.  The claims asserted against Culotta in this litigation are

premised solely on acts, transactions and events arising after the date of his Separation Agreement. Culotta, though previously terminated from his position as Senior VP Corporate Planning, Budget and Analysis in December 2011, continued working for Debtors in a paid consultant capacity after the date of his Separation Agreement. Culotta was hired by Debtors as a consultant at the express requirement of Tallerine, who requested that Hebert, the newly designated replacement CFO, draft a "work plan" for Culotta for Tallerine's review.

184.    In his "consultant" role, Culotta, at Tallerine's direction, assumed continued oversight of the Debtors' audit, working closely with the accounting staff he had overseen before. This included determining how and when now questionable 2011 Tallerine transactions involving theft of Debtors' money would be viewed by Debtors' auditor, Hein & Associates ("Hein"). Because these 2011 transactions were known to Culotta, he was able to ensure they remained undiscovered by Hein, Wayzata, Hebert and the members of the GKH Board. In effect, Culotta was left free to make certain that the 2011 audit (to be issued in 2012) did not uncover or reveal any of these Tallerine transactions. Hebert, in turn, had no reason to suspect wrong doing by Tallerine or Culotta—both were fiduciaries and executives for the period preceding his arrival.

185.    Culotta's manipulations were highly successful for Tallerine: the auditors remained ignorant; the Tallerine thefts never were flagged; and Debtors received a clean audit. Debtors remained uninformed of the Tallerine transfers until late 2012, when Hebert, the other Board members, and Wayzata became aware of what Tallerine had been doing.

186.    Debtors' claims against Culotta do not implicate or constitute a breach of the Separation Agreement. The Culotta Claim should be disallowed in full.

## **Objection Under Section 502**

187.    Any claim made by Tallerine for "service related" activities should be disallowed to the extent that such claim exceeds the reasonable value of the services claimed because Tallerine is considered an "insider" pursuant to section 502(b)(4).

188.    As to each of the Claimants, the claims asserted should further be disallowed to the extent Debtors are entitled to recover from such Claimant on account of sections 542, 543, 550, or 553 of the Bankruptcy Code; or such Claimant is a transferee of a transfer which is avoidable as provided in section 502(d), all as set forth above as to each Claimant.  Each of the Claimants is subject to claims for relief under chapter 5 of the Bankruptcy Code and each is thereby subject to disallowance.

189.    As to Tallerine and Culotta, any claim is further subject to disallowance as to any right or claim premised upon reimbursement or contribution which remains contingent as of the time of such claim for reimbursement or contribution, pursuant to section 502(e).

190.    As to all Claimants, each claim should be disallowed, subordinated or offset on account of the affirmative claims asserted herein.

## **VIII.  PRAYER**

191.    Wherefore, Plaintiffs respectfully request that Defendants be served with process to appear and answer herein, and upon trial or other final hearing of this matter, that the Court award Plaintiffs the following relief:

(a)  recovery of Plaintiffs' actual damages;

(b)  disgorgement of any benefits or funds improperly received by Defendants;

(c)  disgorgement of any compensation or salary received by any Defendant while in breach of his or her fiduciary duties;

(d) disgorgement of the investment interests acquired by Tallerine in violation of the LLC Agreement, including disgorgement of any funds received in connection with these improper investments;

(e) recovery of exemplary and punitive damages;

(f) recovery of Plaintiffs' reasonable and necessary attorneys' fees;

(g) disallowance of all claims filed, or their subordination;

(h) recovery of all property transferred or a judgment for the amount of value taken;

(i) recovery of Plaintiffs' costs of court;

(j) recovery of prejudgment and post-judgment interest; and

(k) any further relief to which Plaintiffs show themselves justly entitled.

192.    With respect to Claimants' Proofs of Claim, the Debtors respectfully request the entry of an order (i) disallowing the claims filed by Tallerine, GEC and Culotta; and (ii) granting related relief.

Respectfully submitted,

**GIBBS & BRUNS, LLP**

By      */s/ Barrett H. Reasoner*
          Barrett H. Reasoner
          breasoner@gibbsbruns.com
          State Bar No. 16641980
          Mark A. Giugliano
          mgiugliano@gibbsbruns.com
          State Bar No. 24012702
          Laura J. Kissel
          lkissel@gibbsbruns.com
          State Bar No. 24046223
          1100 Louisiana, Suite 5300
          Houston, Texas 77002
          Tel:  713-650-8805
          Fax:  713-750-0903

**HAYNES AND BOONE, LLP**

By    */s/ Patrick L. Hughes*
        Patrick L. Hughes
        patrick.hughes@haynesboone.com
        Texas Bar No. 10227300
        Ian T. Peck
        ian.peck@haynesboone.com
        Texas Bar No.  24013306
        Christopher L. Castillo
        christopher.castillo@haynesboone.com
        Texas Bar No. 24065022
        Haynes and Boone, LLP
        1221 McKinney Street, Suite 2100
        Houston, Texas  77010
        Telephone:  (713) 547-2000
        Facsimile:   (713) 547-2600

**ATTORNEYS FOR PLAINTIFFS/DEBTORS**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing instrument was served on all parties of record on July 21, 2014 via CM/ECF.

        */s/  Laura J. Kissel*
        Laura J. Kissel