## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Case No. 13-37200 |
| | § | |
| GOLDKING HOLDINGS, LLC, et al., | § | |
| | § | Chapter 11 |
| Debtors | § | (Jointly Administered) |

| | | |
|---|---|---|
| GOLDKING ONSHORE OPERATING, LLC | § | |
| and GOLDKING HOLDINGS, LLC, | § | |
|   PLAINTIFFS, | § | Adv. Proc. No. 14-03144 |
| v. | § | (Removed from 61st Judicial |
| LEONARD C. TALLERINE, JR.; | § | District Court, Harris County, Texas) |
| GOLDKING ENERGY CORPORATION; | § | |
| GOLDING ENERGY PARTNERS I, LP; | § | |
| GOLDKING ENERGY PARTNERS II, LLC; | § | |
| GOLDKING CAPITAL MANAGEMENT, | § | |
| LLC; RETA WELLWOOD DBA | § | |
| VERMILLION CONTRACTING CO.; | § | |
| DENNA RAMSEY, and PAUL CULOTTA, | § | |
|   DEFENDANTS, | § | |

## ANSWER TO SECOND AMENDED COMPLAINT AND
## SECOND AMENDED COUNTERCLAIM

LEONARD C. TALLERINE, JR.; GOLDKING ENERGY CORPORATION; GOLDKING ENERGY PARTNERS II, LLC; GOLDKING CAPITAL MANAGEMENT, LLC; RETA WELLWOOD DBA VERMILLION CONTRACTING CO.; and PAUL CULOTTA ("Defendants") file this Answer to Plaintiffs' First Amended Complaint and LEONARD C. TALLERINE, JR.; GOLDKING ENERGY CORPORATION; GOLDKING ENERGY PARTNERS II, LLC; GOLDKING CAPITAL MANAGEMENT, LLC; RETA WELLWOOD DBA VERMILLION CONTRACTING CO.; PAUL CULOTTA; and GOLDKING LT CAPITAL CORP. ("Counterclaim Plaintiffs") file this Amended Counterclaim complaining of the wrongful conduct of GOLDKING HOLDINGS, LLC; GOLDKING ONSHORE OPERATING, LLC; WAYZATA OPPORTUNITIES FUND II, LP; WAYZATA

INVESTMENT PARTNERS, LLC; PAT HALLORAN; MARY BURNS; BLAKE CARLSON; MICHAEL STRAIN; RAFAEL WALLANDER; and EDWARD HEBERT ("Counterclaim Defendants"), and would show this Court as follows:

## I. SPECIFIC ANSWERS TO ALLEGATIONS IN AMENDED COMPLAINT

1.      Defendants admit that Tallerine served as the President and CEO or GOO and GKH and deny the remaining allegations of ¶1. Defendants further object that the allegations of the Second Amended Complaint are stated in such an argumentative and slanted way that it is largely impossible to admit even those underlying facts that Defendants do not contest. Defendants incorporate by reference their own factual allegations as stated herein.

2.      Defendants deny the allegations of ¶2.

3.      Defendants deny the allegations of ¶3.

4.      Defendants deny the allegations of ¶4.

5.      Defendants admit the statement of their claims, and deny the remaining allegations of ¶5.

6.      Defendants deny the allegations of ¶6.

7.      Defendants admit ¶7.

8.      Defendants admit ¶8.

9.      Defendants admit ¶9.

10.     Defendants admit ¶10.

11.     Defendants admit ¶11.

12.     Defendants admit ¶12.

13.     Defendants admit ¶13.

14.     Defendants admit ¶14.

15.     Defendants deny that Vermillion Contracting Co. is an entity doing business in Texas, but otherwise admit ¶15.

16.     Defendants admit ¶16.

17.     Defendants admit ¶17.

18.     Defendants admit ¶18.

19.     Defendants admit ¶19.

20.     Defendants admit ¶20.

21.     Defendants deny that LT Capital has failed and refused to make capital calls and that its percentage ownership is subject to change; otherwise admit ¶21.

22.     Defendants deny the allegations in ¶22, except for the dates of formation and employment and titles.

23.     Defendants deny the allegations of ¶23.

24.     Defendants deny the allegations of ¶24.

25.     Defendants deny the allegations of ¶25.

26.     Defendants deny the allegations of ¶26.

27.     Defendants deny the allegations of ¶27.

28.     Defendants deny the allegations of ¶28.

29.     Defendants deny the allegations of ¶29.

30.     Defendants deny the allegations of ¶30.

31.     Defendants deny the allegations of ¶31.

32.     Defendants deny the allegations of ¶32.

33.     Defendants deny the allegations of ¶33.

34.     Defendants deny the allegations of ¶34.

35.     Defendants deny the allegations of ¶35.

36.     Defendants deny the allegations of ¶36.

37.     Defendants deny the allegations of ¶37.

38.     Defendants deny the allegations of ¶38.

39.     Defendants deny the allegations of ¶39.

40.     Defendants deny the allegations of ¶40.

41.     Defendants deny the allegations of ¶41.

42.     Defendants deny the allegations of ¶42.

43.     Defendants deny the allegations of ¶43, except the existence of the Code of Ethics, which is admitted.

44.     Defendants deny the allegations of ¶44.

45.     Defendants deny the allegations of ¶45.

46.     Defendants deny the allegations of ¶46.

47.     Defendants deny the allegations of ¶47.

48.     Defendants deny the allegations of ¶48.

49.     Defendants admit the first sentence and deny the remaining allegations of ¶49

50.     Defendants deny the allegations of ¶50.

51.     Defendants deny the allegations of ¶51, except that the mistaken payments were accounted for and returned.

52.     Defendants deny the allegations of ¶52, except that Bank of America declared a default.

53.     Defendants deny the allegations of ¶53.

54.     Defendants deny the allegations of ¶54.

55.     Defendants are without sufficient knowledge to reply to the allegations relating to the sales process, but otherwise deny the allegations of ¶55.

56.     Defendants deny the allegations of ¶56.

57.     Defendants deny the allegations of ¶57, except for the dates of termination.

58.     Defendants admit ¶58.

59.     Defendants deny the allegations of ¶59, except for the fact of the reappointment and the unlawful refusal to recognize a duly appointed member of the board.

60.     Defendants deny the allegations of ¶60, except for the facts that Tallerine continued to be a member of the board, continued to request information, and continued to be unlawfully excluded from information about his own company.

61.     Defendants deny the allegations of ¶61.

62.     Defendants deny the allegations of ¶62.

63.     Defendants deny the allegations of ¶63.

64.     Defendants deny the allegations of ¶64

65.     Defendants deny the allegations of ¶65.

66.     Defendants deny the allegations of ¶66.

67.     Defendants deny the allegations of ¶67.

68.     Defendants deny the allegations of ¶68.

69.     Defendants deny the allegations of ¶69.

70.     Defendants deny the allegations of ¶70.

71.     Defendants deny the allegations of ¶71.

72.     Defendants admit ¶72.

73.     Defendants admit ¶73.

74.     Defendants make no response to the legal conclusions or to the characterization of documents that speak for themselves, but otherwise admit ¶74.

75.     Defendants admit ¶75.

76.     Defendants make no response to the legal conclusions or to the characterization of documents that speak for themselves, but otherwise admit ¶ 76.

77.     Defendants make no response to the legal conclusions or to the characterization of documents that speak for themselves, but otherwise admit ¶ 77, except for the allegation of a total amount of $13 million, to which Defendants lack sufficient knowledge to admit or deny.

78.     Defendants have insufficient knowledge to respond to the allegations of ¶78.

79.     Defendants have insufficient knowledge to respond to the allegations of ¶79.

80.     Defendants admit ¶80.

81.     Defendants admit ¶81.

82.     Defendants admit the existence of the Culotta claim, but deny the remainder of ¶82.

83.     COUNT 1:  Defendants incorporate their prior responses in answer to ¶83.

84.     Defendants admit ¶84.

85.     To the extent that any factual response is required to the legal conclusions stated in ¶85, denied.

86.     Defendants deny the allegations of ¶86.

87.     Defendants deny the allegations of ¶87.

88.     Defendants deny the allegations of ¶88.

89.     Defendants deny the allegations of ¶89.

90.     Defendants deny the allegations of ¶90.

91.      Defendants deny the allegations of ¶91.

92.      Defendants deny the allegations of ¶92.

93.      COUNT 2:  Defendants incorporate their prior responses to ¶93.

94.      Defendants admit ¶94.

95.      Defendants deny the allegations of ¶95.

96.      Defendants deny the allegations of ¶96.

97.      Defendants deny the allegations of ¶97.

98.      Defendants deny the allegations of ¶98.

99.      Defendants deny the allegations of ¶99.

100.     Defendants deny the allegations of ¶100.

101.     Defendants deny the allegations of ¶101.

102.     COUNT 3:  Defendants incorporate their prior responses to ¶102.

103.     Defendants deny the allegations of ¶103.

104.     Defendants deny the allegations of ¶104.

105.     Defendants deny the allegations of ¶105.

106.     Defendants deny the allegations of ¶106.

107.     Defendants deny the allegations of ¶107.

108.     Defendants deny the allegations of ¶108.

109.     COUNT 4:  Defendants incorporate their prior responses to ¶109.

110.     Defendants admit ¶110.

111.     Defendants deny the allegations of ¶111.

112.     Defendants deny the allegations of ¶112.

113.     Defendants deny the allegations of ¶113.

114.    Defendants deny the allegations of ¶114.

115.    COUNT 5:  Defendants incorporate their prior responses to ¶115.

116.    Defendants deny the allegations of ¶116.

117.    Defendants deny the allegations of ¶117.

118.    COUNT 6:  Defendants incorporate their prior responses to ¶118.

119.    Defendants admit ¶119.

120.    Defendants deny the allegations of ¶120.

121.    Defendants deny the allegations of ¶121.

122.    Defendants deny the allegations of ¶122.

123.    Defendants deny the allegations of ¶123.

124.    COUNT 7:  Defendants incorporate their prior responses to ¶124.

125.    Defendants admit ¶125.

126.    Defendants deny the allegations of ¶126.

127.    Defendants deny the allegations of ¶127.

128.    Defendants deny the allegations of ¶128.

129.    Defendants deny the allegations of ¶129.

130.    COUNT 8:  Defendants incorporate their prior responses to ¶130.

131.    Defendants admit ¶131.

132.    Defendants deny the allegations of ¶132.

133.    Defendants deny the allegations of ¶133

134.    Defendants deny the allegations of ¶134.

135.    COUNT 9:  Defendants incorporate their prior responses to ¶135.

136.    Defendants deny the allegations of ¶136.

137.     Defendants deny the allegations of ¶137.

138.     Defendants deny the allegations of ¶138.

139.     Defendants deny the allegations of ¶139.

140.     Defendants deny the allegations of ¶140.

141.     COUNT 10:  Defendants incorporate their prior responses to ¶141.

142.     Defendants deny the allegations of ¶142.

143.     Defendants deny the allegations of ¶143.

144.     Defendants deny the allegations of ¶144.

145.     Defendants deny the allegations of ¶145.

146.     Defendants deny the allegations of ¶146.

147.     Defendants deny the allegations of ¶147.

148.     COUNT 11:  Defendants incorporate their prior responses to ¶148.

149.     Defendants deny the allegations of ¶149.

150.     No factual response is necessary to ¶150.

151.     Defendants deny the allegations of ¶151.

152.     Defendants deny the allegations of ¶152.

153.     Defendants deny the allegations of ¶153.

154.     Defendants deny the allegations of ¶154.

155.     Defendants deny the allegations of ¶155.

156.     No factual response is necessary to ¶156.

157.     Defendants deny the allegations of ¶157.

158.     COUNT 12:    Defendants incorporate their prior responses to ¶158.

159.     Defendants deny the allegations of ¶159.

160.    No factual response is necessary to ¶160.

161.    Defendants deny the allegations of ¶161.

162.    Defendants deny the allegations of ¶162.

163.    No factual response is necessary to the statement of the law in ¶163; otherwise, denied.

164.    COUNT 13:  Defendants incorporate their prior responses to ¶164.

165.    Defendants deny the allegations of ¶165.

166.    Defendants deny the allegations of ¶166.

167.    No factual response is necessary to ¶167.

168.    Defendants deny the allegations of ¶168.

169.    Defendants deny the allegations of ¶169.

170.    No factual response is necessary to the statement of the law in ¶170; otherwise, denied.

171.    COUNT 14:  Defendants incorporate their prior responses to ¶171.

172.    Defendants deny the allegations of ¶172.

173.    Defendants deny the allegations of ¶173.

174.    Defendants deny the allegations of ¶174.

175.    PROOFS OF CLAIM:  Defendants deny the allegations of ¶175.

176.    Defendants deny the allegations of ¶176.

177.    Defendants deny the allegations of ¶177.

178.    Defendants deny the allegations of ¶178.

179.    Defendants deny the allegations of ¶179.

180.    Defendants deny the allegations of ¶180.

181.    Defendants deny the allegations of ¶181.

182.    Defendants deny the allegations of ¶182.

183.    Defendants deny the allegations of ¶183.

184.    Defendants deny the allegations of ¶184.

185.    Defendants deny the allegations of ¶185.

186.    Defendants deny the allegations of ¶186.

187.    Defendants deny the allegations of ¶187.

188.    Defendants deny the allegations of ¶188.

189.    Defendants deny the allegations of ¶189.

190.    Defendants deny the allegations of ¶190.

191.    Defendants deny the allegations of ¶191.

192.    Defendants deny the allegations of ¶192.

## II. AFFIRMATIVE DEFENSES AND COUNTERCLAIM

**A.    PARTIES**

193.    LEONARD C. TALLERINE, JR.; GOLDKING ENERGY CORPORATION; GOLDKING ENERGY PARTNERS II, LLC; GOLDKING CAPITAL MANAGEMENT, LLC; RETA WELLWOOD DBA VERMILLION CONTRACTING CO., and PAUL CULOTTA are parties to this action.

194.    Counterclaim Plaintiff GOLDKING LT CAPITAL CORP. is a Delaware Corporation with its principal place of business in Houston, Texas.

195.    GOLDKING HOLDINGS, LLC ("GKH") and GOLDKING ONSHORE OPERATING, LLC ("GOO") (collectively the "Company") are parties to this action.

196.    WAYZATA INVESTMENT PARTNERS, LLC ("Wayzata Investment Partners") is a Delaware limited liability company with its principal place of business in Wayzata Investment Partners, Minnesota. Wayzata Investment Partners is a party to this action.

197.    WAYZATA OPPORTUNITIES FUND II, LP ("Wayzata II") is a Delaware limited partnership with its principal place of business in Wayzata, Minnesota. Wayzata II does business in Texas through its control of the Company and by committing torts in Texas as alleged herein. Wayzata II is a party to this action.

198.    PAT HALLORAN is an individual resident of Minnesota. Halloran is a partner in Wayzata Investment Partners and does business in Texas through his control of the Company and by committing torts in Texas as alleged herein. Halloran is a party.

199.    MARY BURNS is an individual resident of Minnesota. Burns is a partner in Wayzata Investment Partners and does business in Texas through her control of the Company and by committing torts in Texas as alleged herein. Burns is a party.

200.    BLAKE CARLSON is an individual resident of Minnesota. Carlson is a partner in Wayzata Investment Partners and a manager/director of the Company and does business in Texas through his control of the Company and by committing torts in Texas as alleged herein.  Carlson is a party.

201.    MICHAEL STRAIN is an individual resident of Harris County, Texas.  Strain is an officer of Wayzata Investment Partners, a manager/director of the Company and the Chief Executive Officer of the Company. Strain is a party.

202.    RAFAEL ("Ray") WALLANDER is an individual resident of Minnesota. Wallander is an officer of Wayzata Investment Partners and an officer of the Company and does

business in Texas through his control of the Company and by committing torts in Texas as alleged herein. Wallander is a party.

203.     Wayzata Investment Partners, Wayzata II, Halloran, Burns, Carlson, Strain, and Wallander are referred to collectively as "Wayzata."

204.     EDWARD ("Eddie") HEBERT is an individual resident of Harris County, Texas. Hebert is the Chief Executive Officer of the Company. Hebert is a party.

## B.     COMMON FACTUAL ALLEGATIONS

### 1.     FORMATION OF THE COMPANY

205.     Wayzata Investment Partners is a private equity investment firm that specializes in investing in "distressed assets, undervalued assets, and special situations"—in other words, a company that finds businesses in financial trouble or emerging from bankruptcy and exploits their vulnerabilities, provides them with desperately-needed funding, but exacts exorbitant interest rates and terms, and frequently squeezes out the original owners. Wayzata Investment Partners is controlled by its majority partner, Pat Halloran. Other partners include Blake Carlson and Mary Burns. Ray Wallander and Michael Strain are officers of Wayzata Investment Partners. Wayzata operates through investment funds, which it controls, including Wayzata II.

206.     Leonard C. Tallerine, Jr. is a successful oil and gas businessman, with more than thirty years' experience in the Gulf Coast region, during which time Tallerine amassed considerable knowledge, experience, and industry contacts in Texas and Louisiana. Tallerine owns the "Goldking" name, and Tallerine does and has done business using the "Goldking" name for decades through more than a dozen different entities.

207.     In May 2007, Tallerine sold his company, Goldking Energy Corporation, to Dune Energy, Inc. Goldking Energy (a private company) merged into Dune Energy (a public

company), with Dune Energy being the surviving company. Tallerine retained the Goldking name and changed the name of one of his other companies to "Goldking Energy Corporation." Tallerine, and the new Goldking Energy and its other affiliates then pursued a number of ventures—one of which was the restructuring of East Cameron Partners, a bankrupt oil and gas company, through Goldking Capital Management, which was appointed Chief Restructuring Officer by the United States Bankruptcy Court.

208.    In early 2009, Wayzata began acquiring bonds (10.5% Senior Secured Notes) issued by Dune Energy. During the course of these acquisitions, which ultimately reached a total of approximately $90 million, Wayzata partners and executives spent a considerable amount of time in Houston secretly meeting with and collecting information from Dune's management. During this process, Wayzata also sought meetings with Tallerine because of his knowledge of Dune's assets as the CEO immediately prior to the Goldking/Dune merger. Wayzata had little expertise in oil and gas exploration and production and particularly no expertise or knowledge of the Gulf Coast. However, Wayzata knew that Tallerine had extensive knowledge of the regions and prospective areas in which Dune operated. During numerous meetings over several months, Wayzata came to value Tallerine's knowledge and experience in the Gulf Coast oil and gas industry and with the Dune assets.

209.    Wayzata also interacted with Tallerine and had the opportunity to see his operating results during 2009 and 2010 because Wayzata had invested in a number of companies being administered in the same bankruptcy court that administered Tallerine's restructuring and operation of East Cameron Partners. During the latter part of 2009, Tallerine made a presentation to Wayzata about the East Cameron Partners' properties so that Wayzata could evaluate bidding for those properties in a Bankruptcy Court auction.

210.    In late 2009 or early 2010, Wayzata approached Tallerine with its interest in forming a new oil and gas venture with Tallerine in Houston, Texas, to take advantage of Tallerine's extensive knowledge and experience, his business reputation and standing in the industry, and the team of professionals with whom he was affiliated. Tallerine knew Wayzata's reputation for taking advantage of businesses in which it invested, but Pat Halloran, Blake Carlson, and Mike Strain assured him that this was a different situation, that Wayzata was transitioning its business out of distressed debt due to the recovery of the economy, and that Wayzata's new investment focus would be on building real value in real companies. Wayzata represented that it intended to invest in an oil and gas company for the long haul, and that Tallerine would be given true operational control. Halloran, Carlson, and Strain repeatedly assured Tallerine that Wayzata's intent was to build value and that their investment would be "a marathon, not a sprint."

211.    Based on the extensive discussions over many months between the parties prior to forming the Company, both Tallerine and Wayzata understood and expected that Tallerine would be employed by and would manage the new venture, which would operate under his "Goldking" name, thus benefitting from the decades of goodwill that built up by Tallerine. Initially, Wayzata insisted that Tallerine would not be compensated for running the new company, but would depend solely on his equity interest for a return on his investment. Tallerine absolutely refused. As a condition of the investment, the parties eventually agreed that Tallerine would receive monetary compensation of $350,000.00 salary and a minimum $50,000.00 bonus each year in addition to equity. The parties agreed and understood that Tallerine's salary and bonus were important components of the return on his investment and were central to his decision to invest. Tallerine also informed Wayzata that he intended to invest several million dollars of his own

money into the new venture, but that his ability to continue infusing capital would be limited. Wayzata assured Tallerine that, when he reached his limit, Wayzata would continue to fund without diminishing Tallerine's equity interest.

212.    Goldking Holdings, LLC ("GKH") and Goldking Onshore Operating, LLC ("GOO") (collectively the "Company") were formed by the filing of Certificates of Formation with the Delaware Secretary of State on March 3, 2010, pursuant to the Delaware Limited Liability Company Act (the "Act"). GOO would be the operating entity with GKH as its sole member. The Company's governance was set forth in an initial Limited Liability Company Agreement of Goldking Holdings, LLC, entered into effective July 13, 2010, by its members, Tallerine, Jr. and Wayzata II, and by its initial manager, Wayzata Investment Partners. The original LLC Agreement set Tallerine's ownership interest at 10% and his initial capital contribution at $190,000. Section 5.5 of this agreement eliminated fiduciary duties among the members.

213.    Effective August 31, 2010, the parties entered into the Amended and Restated Limited Liability Company Agreement of Goldking Holdings, LLC (the "Amended Agreement"), which made several important changes. Tallerine's equity interest would be held by and through his wholly-owned corporation, Goldking LT Capital Corp. ("Goldking LT"), and was reduced to 6.25%; however, this 6.25% contained a promoted interest component whereby Tallerine would ultimately be responsible for 5% of the capital investment, and additional provisions would increase that interest up to 15% as the Company reached certain milestones in distributions to its owners. Wayzata's interest would be held by Wayzata II. The Amended Agreement refers to Goldking LT as the "Minority Investor" and to Wayzata II as the "Wayzata Investor." The governance of the Company was changed to a corporate model utilizing a three-

person board of manager/directors with one manager/director selected by Goldking LT and the other two selected by Wayzata II. The initial managers were designated as Carlson and Strain, representing Wayzata II, and Tallerine, representing Goldking LT.

214.    The Amended Agreement removed the provision eliminating fiduciary duties and replaced it with narrower limitations. The Amended Agreement also set Goldking LT's maximum capital commitment at $2,044,041. The Amended Agreement did not provide for dilution of Tallerine's 6.25% interest, but there was the possibility of proportionate reductions in the future increases to the 15% interest if Tallerine's level of capital contributions fell below 5% of the total. Ultimately, Tallerine contributed almost $4 million in capital contributions, almost twice his required maximum. Throughout this dispute and in the Petition, Wayzata and Plaintiffs claim that Tallerine is required to invest additional capital and that he has violated his obligations under the agreements of the parties. These claims are false and in violation of the Amended Agreement—and are clearly made in bad faith as they fail to disclose to the Court that even today Tallerine's total capital investment remains in excess of the 5% contemplated by the parties.

### 2.    Tallerine Advances Transaction Costs and the Transition Costs

215.    Beginning in late 2009, Tallerine and his staff began to identify properties that the Company would acquire and on which the business would be founded. Tallerine and his staff ultimately located a package of properties with promising opportunities (known as the "White Oak" properties) and conducted extensive due diligence. During this process, Tallerine received no compensation or assistance from Wayzata and paid all of the start up costs, all of the staff salaries and benefits, all of the vendors and consultants, all of the overhead, and all of the various costs and expenses of the due diligence (the "Transaction Costs").

216.   The work on the acquisition was performed by Tallerine, by employees on the payroll of Goldking Energy Corporation, and by employees on the payroll of Walker Street Consulting, LLC ("Walker Street"), a company owned by Paul Culotta. Walker Street was formed by Paul Culotta, its sole member, on April 17, 2010, primarily for the purpose of entering into a contract with EC Offshores Properties, Inc. ("ECOP"), the company that had bought certain assets of East Cameron Partners out of bankruptcy. Walker Street became the manager of those properties for which it was paid a flat monthly fee. Tallerine and Culotta had negotiated the contract, and Tallerine provided management services for the properties through agreements between several of his companies and Walker Street. At the time of the formation of the Company, the existence and business of Walker Street Consulting was fully disclosed to Wayzata, as well as the intent of Culotta and Tallerine to continue working on the ECOP contract until it was terminated or until the properties were sold. However, very little management or accounting time was required on that project, and essentially all of work time of Culotta and the other Walker Street employees was spent on the White Oak acquisition. Effective October 16, 2010, the beginning of the Company's first payroll period, Tallerine, Culotta, and the various Goldking Energy and Walker Street employees all became employees of the Company.

217.   The fact that both Goldking Energy employees and Walker Street employees worked on the White Oak acquisition for the benefit of the Company was fully disclosed to Wayzata. Tallerine submitted payroll logs and health insurance documents to the Company that showed Paul Culotta, Denna Ramsey, and Rodney Holloway were Walker Street employees.[1] Wayzata's employees and representatives on the Company's board of manager/directors worked

---

[1] Additionally, Steve Venturatos was an independent contractor, who was consulting for Walker Street. His consulting agreement was provided to Wayzata and to Plaintiffs.

closely with all three of the Walker Street employees, reviewed and utilized their work product, and interacted with them throughout the due diligence and start up process. Wayzata knew that these employees were working full time for the benefit of the Company.

218.    Tallerine paid all the costs to set up operations for the new company and all overhead and operating costs for the first six weeks (the "Transition Costs"). Additionally, Tallerine permitted the new company to use the "Goldking" name and the www.goldkingenergy.com domain. Subsequently, a website was created in which the Company appropriated Tallerine's by holding itself out as a continuation of the Goldking companies that have been in business in Texas since 1968. Tallerine permitted the Company to use his personal furniture, artwork, and equipment, with the understanding that all of these items would remain Tallerine's property and that he would utilize the furniture in his own office for personal as well as Company business. At the Company's first board meeting on September 7, 2010, Tallerine presented the board an inventory of personal property that he was allowing the Company to use.

219.    Through October of 2010, Tallerine paid all of the Transaction Costs and all of the Transition Costs. In total, Tallerine advanced funds for the Company's benefit totaling $760,962.05. Tallerine was not fully reimbursed by the Company until after February 2011. Tallerine was paid no interest on these amounts by the Company or by Wayzata. He also received no compensation for the use of the Company's name or website or for the use of his furniture, artwork, and equipment.

220.   When Tallerine invoiced the Company for reimbursement of funds he had advanced on the Company's behalf, he submitted a notebook containing a detailed accounting of all of the Transaction Costs and another notebook containing a detailed accounting of all of the Transition Costs. Strain scrutinized these records thoroughly, questioned numerous charges, rejected or adjusted many of them, and ultimately approved each and every charge that was paid—including the roughly $200,000 in salary and wage claims that the Company now claims are false.



3.   **VERMILLION CONTRACTING PAYMENTS**

221.   Vermillion Contracting Co. is a sole proprietorship business owned by Reta Wellwood. Almost fifteen years ago, Ms. Wellwood had been married to Mr. Tallerine. They remained friends after their divorce.[2] In 2006, Wellwood relocated to southern Louisiana to be near family and proposed to Tallerine that he hire her to perform non-skilled yard work and clean-up on some of his companies' well sites near her new residence. Tallerine agreed. Wellwood purchased a truck, a trailer, lawn mowers, shovels, rakes, and other equipment with her own funds. She registered the business name of Vermillion Contracting and set up a bank account for Vermillion Contracting on which she is the only signatory. Periodically, as routine

---

[2] There is nothing inherently illegal or unethical about hiring persons known to a company's management or even connected to them by friendship or family ties. In 2011, at Michael Strain's insistence, the Company hired his sister and paid her a salary specified by Mr. Strain.

unskilled work was necessary for well sites owned by Tallerine's companies, Vermillion would hire crews of day laborers to perform the work. Wellwood provided the equipment and transportation for the crew and personally supervised their work. She prepared detailed invoices stating the work that was done. Tallerine utilized the services of Vermillion Contracting as a vendor for his several of his companies from 2006 until 2010–2011, when he hired Vermillion Contracting as a vendor to provide the same type of services to the Company. Wellwood proved herself to be a diligent, trustworthy, and reliable vendor. She was known to several of the Company's employees as a regular vendor. Wellwood performed the work and was paid a fair price for her services by the Company. The Company's claim that Vermillion is an entity owned by Tallerine that submitted bogus invoices is absolutely baseless.

### 4.    TALLERINE'S OUTSIDE WORK

222.    At the time the Company was established and throughout Tallerine's tenure as president and CEO, he maintained several other "Goldking" entities and had other investments and business ventures. At the time the Company was formed, and on several subsequent occasions, Tallerine proposed to Wayzata that he contribute as capital all of his separate oil and gas interests, which included mineral, royalty, or working interests in 21 states and six offshore blocks, and an extensive 3-D seismic shoot with oil and gas leases and drilling opportunities. Tallerine suggested that this consolidation would avoid any possible future concerns over conflicts of interest. Tallerine prepared a detailed binder disclosing every investment, every well, every company, and every project that might be of interest to the Company. Each time, Wayzata declined to consider Tallerine's proposal. Wayzata agreed that Tallerine would be permitted to continue his existing businesses in addition to management of the Company.

223.    In the Amended Agreement, Section 6.09 waives all conflict of interest obligations of Wayzata and its affiliates and permits Wayzata to invest in other businesses that directly compete with the Company. Section 6.10 of the Amended Agreement restricted Tallerine's ability to pursue other ventures in the oil and gas industry (although not in other industries) but specifically permitted all of the businesses and ventures in which Tallerine and his companies were engaged at the time that the Amended Agreement was executed. The binder listing all of his then-existing companies, investments, ventures and projects was incorporated into the Amended Agreement by reference in Exhibit 6.10 of the Amended Agreement. Tallerine's other business ventures and his hiring of certain Goldking employees to handle after-hour tasks was fully disclosed to Wayzata, which agreed to Tallerine's pursuit of these ventures and his use of his Company email and mailing address and the small portion of his own time and that of his assistant for the purpose of managing these other ventures.

224.    One of these other ventures was the ownership and operation of a private plane through Goldking Energy Corp. Wayzata partners and employees personally benefitted from travel on that airplane. The Company entered into a written contract with Tallerine providing the terms for reimbursement of the use of that plane for Company business by Tallerine and other Company employees. Tallerine also offered Carlson, Halloran, and Strain several opportunities to participate as joint purchasers of pools of mineral interests, royalties, and overriding royalty interests. Carlson and Halloran accepted Tallerine's offer and bought in as participants in a royalty pool through one of Tallerine's outside ventures.

225.    Tallerine's management of the Company, including his use of resources on Company property to manage his other ventures, was done openly and transparently. Strain, Carlson, and other Wayzata partners and employees visited and worked in the Company offices

frequently and regularly. In fact, Tallerine had discussions with Strain and Carlson about his intention to create completely separate work areas for his other ventures, and three offices within the Company's office suite were placed under a separate lease to Goldking Energy expressly for the purpose of separating work and storage space for Tallerine's other ventures.

226.    In addition to other property that Tallerine permitted the Company to use, he provided a server previously used by his company. Subsequently, it was determined that this server was not adequate for the Company's needs, and the Company purchased two new servers. Tallerine's server was connected to the Company's network to allow Tallerine and his assistant to access it and maintain the electronic files relating to Tallerine's personal business and his non-Company business ventures.[3] Paper records for these other ventures were initially kept in the Company's offices. Eventually, Tallerine moved most of these records across the hall to Suite 2500A, a separate office also leased by Goldking Energy. The nameplate on this office clearly stated "Goldking Energy Partners/Leonard C. Tallerine, Jr." The Wayzata partners and employees would have seen that sign every time they made their way to the men's room. Tallerine originally paid all rent on Suite 2500A, but later the Company began to cover the cost of the rent on Suite 2500A because Tallerine agreed to utilize the space for the benefit of the Company in a number of ways, including providing workspace for consultants performing services for the Company.

227.    Throughout his tenure as president and CEO of the Company, Tallerine devoted substantially all of his regular business time to the Company's affairs. Tallerine actively managed the Company and devoted the time and attention that would ordinarily be expected of a senior executive in the oil business. His other ventures took little of his time and attention

---

[3] Extensive electronic records were maintained on this server relating to the ownership, the management, and administration of the royalty pools for the benefit of the participating owners—including Halloran and Carlson.

overall, were attended to largely outside of normal business hours, and did not interfere with his management of the Company in the slightest. Instead, many of these ventures benefited the Company, such as Goldking Energy, which provided a plane for the Company's use, and office space and resources for the Company's benefit. Tallerine hired several Company employees to perform minor services for his other ventures—these services were accomplished outside of normal working hours, did not interfere with their work for the Company, and were paid for separately by Tallerine or his other companies.

### 5.     MISTAKES IN HANDLING COMPANY FUNDS

228.   In late June 2011, the accounting department alerted their CFO, Defendant Culotta, that the Company had mistakenly paid certain non-Company invoices and had mistakenly deposited some Company funds into non-Company accounts. The invoices and accounts belonged to other Tallerine entities. The mistakes were the result of confusion caused by the fact that all of these entities as well as the Company used the "Goldking" name and had the same address, by the fact that many companies incorrectly continued to address invoices and checks simply to "Goldking" without noting which "Goldking," and sometimes mistakenly to "Goldking Energy," and by the fact that the clerks who made the deposits or wrote the checks were not as careful as they should have been. Neither Tallerine nor Culotta nor any of Tallerine's companies were responsible for any of these transactions and were not even aware that these mistakes had been made at the time. The Company policy at the time was that GOO checks payable to vendors did not come back to Tallerine for signature, and Tallerine did not personally perform any wire transfers. Therefore, he reviewed none of these erroneous transactions.

229.   Moreover, virtually all of these transaction errors occurred during a period of less than thirty days between May 19 and June 17, 2011, and during some of this period Tallerine was not even in the country. These transactions included the following:

- During the last week of May and the first week of June 2011, four checks that GOO had issued to vendors were mistakenly deposited into the account of Goldking Energy Partners I: two May 19 checks for $59,805.74 and $57,921.69 to Phoenix Exploration, a June 1 check for $15,811.50 to Charter Capital, and a June 1 check for $117,039.86 to Pioneer Drilling Services. The accounting department had issued these checks in response to invoices from vendors, but Tallerine disputed the Company's responsibility to pay these invoices and instructed that these checks be voided. A Comerica bank check scanner had recently been installed in the area where mail was opened, and the administrative assistant who handled these voided checks was not completely familiar with the use of that equipment. She believed that it was necessary to scan the checks in order to redeposit the money back in GOO's account at Comerica Bank. This understanding was incorrect, but it was a good faith mistake. The checks were accidentally deposited into Goldking Energy Partners I's account at the same bank. It is not known why Comerica Bank credited those deposits on its end, but apparently the bank made a mistake as well.

- On May 26, a $3,000.00 GOO check was issued to pay for work that had been done on a Galveston residence owned by Tallerine's family. The invoice was made out to Goldking Energy, and Tallerine had written a note to his assistant on the invoice to issue a check for payment. Tallerine intended that a Goldking Energy check be issued, but the wrong company's check was issued.

- On June 6, a $28,225.11 GOO check was issued to Jackson & Ryan Architects for work done on a business owned by Tallerine's daughter. Jackson & Ryan is a Company vendor that did substantial work for the Company. Three other checks were issued by the Company to that vendor at about the same time. This invoice was paid under the mistaken belief that it was for Company work. The same thing happened the following week on June 13, when GOO made a $73,228.32 wire transfer to Tejas Interiors for work done for Tallerine's daughter. Again, Tejas Interiors is a Company vendor that did extensive work on the Company offices. Tallerine subsequently hired them to do construction work on his daughter's new business. Tejas sent the invoice to Tallerine at his office, and the Company paid it under the mistaken belief that it was intended for the Company.

- On June 13, GOO made a $24,967.90 wire transfer to Gulfstream Aerospace for charges related to a plane owned by Goldking Energy. On June 14, a $38,124.90 Russo Exploration check made out only to "Goldking" was deposited into Goldking Energy account. In both of these instances, someone at the Company simply mixed up Goldking Energy for Goldking Onshore Operating.

- On June 17, a $43,000.00 wire transfer from GOO's account went to one of Tallerine's personal accounts. At this time, Tallerine was overseas and had requested his assistant transfer money from one of his accounts to his personal account. Unfortunately, she transferred the money from the incorrect account.

230.    On or about June 15, 2011, Tallerine and his wife had left for an extended vacation in Europe. The Company's accounting department realized there was a problem within a few weeks after the erroneous transfers began and alerted Culotta, who immediately called Tallerine in Italy. Tallerine, while he was still on vacation in Italy, immediately began transferring funds from his personal and business accounts to the Company in order to rectify the error and put back the Company's money that had unintentionally been transferred. Between June 22 and June 28, Tallerine transferred $450,000.00 to the Company to correct the erroneous transactions. Tallerine instructed Culotta to conduct a thorough audit of the Company's books to make sure that all the money had been accounted for and repaid and to determine if any further erroneous transactions had occurred.

231.    As a result of this review, Culotta and the accounting department discovered only three other mistaken transactions: (1) a December 13, 2010 check for $12,755.10 from Hines that had been incorrectly made payable to "Goldking Energy" was deposited into Goldking Energy's account, and (2) a February 28, 2011 check for $35,593.51 from Pioneer Drilling Services that had also been mistakenly deposited into the wrong Goldking's account. An April 28, 2011 payment for $8,064.63 to Ponce Services, Inc. for work done on a property owned by Tallerine had mistakenly paid by the Company because the vendor addressed the invoice only to "Goldking."

232.    One transaction that Culotta questioned, but which turned out not to be erroneous, was a $100,000.00 wire transfer from GOO to Goldking Energy on April 14, 2011. At the time, Strain, Carlson, and Halloran had agreed to purchase jointly with Tallerine certain royalty

interests owned by Hemus, Inc. as a personal investment.[4] Because this would be an investment by the principals, and not the company, it was agreed that the offer would be made through Goldking Energy Corp as the agent for negotiating the transaction. In order to initiate the purchase offer process, Hemus, Inc. required receipt of a check in the amount of $100,000.00 as a deposit on the transaction. Strain, Carlson, and Hallerin insisted that Tallerine have the Company fund the deposit, which would be returned to the Company if the purchase were consummated. Therefore, Tallerine had $100,000.00 transferred to Goldking Energy to cover the deposit. Goldking Energy issued the deposit check and submitted an offer to acquire the royalties. Hemus then provided Tallerine with more detailed technical data regarding the royalty interests. Ultimately, Tallerine recommended against the purchase, and Strain, Carlson, Halloran, and Tallerine withdrew the purchase offer, whereupon Hemus returned the check to Goldking Energy, and Goldking Energy returned the money to the Company.  All of this was done with the knowledge and agreement of all managers of the Company and representatives of both members of the Company.

233.   Under Tallerine's management, the Company had a policy to make reasonable expense advances when extensive travel was to be required for an employee or major expenditures by an employee for the Company's benefit were anticipated. Tallerine received such advances from time to time. This policy and these advances are normal procedures for most companies and were well within Tallerine's authority and business judgment. All of the advances were for the purpose of benefitting the Company and were fair to the Company. All of the advances were properly recorded on the Company's books. All of the advances were properly reconciled to properly documented expense reports.

---

[4] This would have been a similar investment to the one made by Carlson, Halloran, and Tallerine in royalties through Goldking Energy Partners III in 2012.

234.    In its financial records, the Company maintains accounts to book related party transactions, including a specific account to book transactions involving Tallerine or his other companies (the "Tallerine Account"). The Company's accounting department posted all intercompany transactions involving Tallerine and his affiliates to this account, which could have a credit, debit, or zero balance at any time. This account was a line item in the Company's financial statements, and the details of all transactions in that account were always available to all board members. When each of the erroneous transfers were discovered, the Company's accounting department booked the transaction to the Tallerine Account per normal Company procedure.

235.    In the summer of 2011, and with Tallerine's knowledge and support, Culotta immediately undertook to make a detailed review of all the Company's transactions to verify that all payments to and from Tallerine and his companies were properly booked in the Company's financial records. Donna McCulloch and Ken Cleveland, two members of the Company's accounting department, as well as Culotta, undertook this review. Each and every intercompany transaction was either verified as properly booked in the accounting records or immediately recorded on the Company's financial records in the Tallerine Account. Culotta also prepared a detailed report identifying and accounting for every such transaction and all expense advances and reimbursements to Tallerine. Culotta completed a preliminary report on September 14, 2011 and went over it with Tallerine.

236.    In September 2011, Wayzata informed Tallerine that it wanted its own man in control of the Company's finances, and Wayzata directed Tallerine to replace Culotta as CFO with Counterclaim Defendant Hebert. Hebert had previously been the CFO of a bankrupt public company called Saratoga Resources, Inc. in which Wayzata was the largest creditor in the course

of the bankruptcy. As a result of dealing with Hebert in the Saratoga bankruptcy, Wayzata either came to believe that Hebert was a reliable agent or perhaps believed that it owed Hebert for favors he had done for them during the bankruptcy. In any event, Hebert was Wayzata's choice for CFO. Unlike Culotta, Hebert would attend all board meetings, would report frequently and directly to Strain and Carlson, and would work regularly with Eitan Bernstein, a Wayzata attorney and financial expert. Bernstein and Hebert worked together frequently both at Bernstein's Houston office and at the Company's offices.

237.    Hebert began with the Company in October 2011, and as part of Hebert's transition to CFO, Culotta presented Hebert with a notebook containing the preliminary report and back-up documents. Culotta continued on as a Company employee through the end of the year and, under Hebert's supervision, continued to work on the report, which was updated through year-end to reflect  new information, the refund of the Hemus deposit, and Tallerine's completion of documentation and submission of his expense reports. Hebert scrutinized every page and every transaction in the report and initialed or signed every page to record his approval of every entry. In the end, not only had Tallerine repaid every dime that the Company had mistakenly transferred, but the Company actually owed Tallerine $16,314.78. Hebert approved that balance and initialed the schedule showing that all the transfers, repayments, and the amount owed to Tallerine. Every identifiable transaction about which Plaintiffs complain in the Original Petition is stated

explicitly described in Culotta's report. Even the language used in the Original Petition complaining about the transactions largely comes from Culotta's report.

238.   After the mistaken handling of funds was detected and corrected, Tallerine and Culotta also put into effect new procedures and controls to make sure that the same errors would not be repeated. Those new procedures required that Tallerine and the Controller jointly and independently verify that every check was to and from the correct Goldking entity. The new procedures were extremely effective, because over the next 18 months, only three other mistakes occurred: On August 21, 2011, the Company incorrectly paid an invoice for $533.00 from SMBology, Inc., a vendor that did work both for the Company and for Tallerine. That error was quickly identified and repaid. On September 22, 2011, the Company incorrectly paid an $18,092.48 Cawley Gillespie & Associates, Inc. invoice for engineering services to Goldking Energy. That mistake was caught on September 27 and was repaid. Then, about a year later, on September 5, 2012, the Company transferred $32,200.00 to an account at Comerica Bank maintained by the law firm of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard on behalf of Goldking Capital Management. The Lugenbuhl firm represented the Company on several matters, but also represented other Tallerine interests. The accounting department mistakenly assumed that the $32,200.00 was a request for payment for Company work. When the mistake was discovered, Tallerine was told that Hebert was the person who made or approved the mistaken payment. The money was repaid in full on November 20, 2012.

239.   Hebert made a similar mistake a few weeks later, after Tallerine had been fired and locked out of the Company. Hebert and FTI Consulting had been opening, examining, and holding all mail that was delivered to the Company for Tallerine personally or for one of his companies. On December 24, 2012, Hebert and Innes allowed Tallerine's assistant to pick up a

box of mail belonging to Tallerine that they had been accumulating since December 17, 2012. In the box was a check to the Company in the amount of $184,180.67. It seems the height of bad faith to sue Tallerine because some employees working under him sometimes mixed up companies with similar names, when Wayzata's handpicked CFO (who was **not** let go when Tallerine and all of his alleged "co-conspirators" were fired) and the Company's forensic accountants (who were brought in to investigate Tallerine's "theft of funds") made exactly the same mistake.

### 6. CONSULTATION ON DUNE ENERGY

240.    Throughout 2009–2012, Wayzata continued to request Tallerine's advice on its $90 million investment in Dune Energy bonds. In early 2010, Tallerine told Strain, Carlson, and Halloran that he would be happy to continue to consult with Wayzata on other matters, such as Dune Energy, but that he expected to be compensated for his services. Strain and Carlson offered to pay a consulting fee to Tallerine out of whatever profits Wayzata realized on its Dune Energy investments equal to the same percentage of Tallerine's interest in the Company. Tallerine agreed and continued to provide consulting services to Wayzata as requested. Later, Pat Halloran confirmed the arrangement to Tallerine.

241.    Based in part on Tallerine's advice, Wayzata II entered into a new and highly lucrative credit facility agreement with Dune Energy in December 2010, in which Wayzata acquired Dune's $40 million bank debt, received 15% interest on debt, and obtained a first lien on Dune's assets. As a result of this transaction, Dune Energy was able to go forward with major drilling projects, and the market price of Dune Energy's bond soared. The major new project initiated by Dune Energy was the drilling of a well in Garden Island Bay, Plaquemines Parish, Louisiana, and an area with which Tallerine is very familiar. In early 2011, Tallerine advised

Wayzata that the new well was extremely risky and that Wayzata should sell out its investment in Dune Energy bonds while the market price was still high. Based on Tallerine's advice, Wayzata began to liquidate its investment. Wayzata had Tallerine contact and negotiate with potential purchasers. As a result, Wayzata was able to liquidate its investment and net a profit of approximately $40 million.

242.     In July 2011, Dune Energy announced that the Garden Island Bay well was a dry hole, and the market value of the Dune Energy bonds plummeted. As a result, Dune Energy was forced to undertake a financial restructuring in December 2011 in which the bonds were converted into common stock, but in which the Dune Energy debt held by Wayzata II was completely paid off.

243.     During 2012, Wayzata acknowledged several times that it owed a consulting fee to Tallerine, but put him off regarding the timing of the payment. In November 2012, Tallerine, at Wayzata's invitation, went on a hunting trip in South Dakota with Carlson, Strain, Halloran and Wayzata executives. The event was completely cordial. At one point, the discussion turned to the capital needs of the Company. In October, the board had voted a capital call, and Wayzata insisted that Tallerine provide additional capital. Up to this point, Tallerine had already funded almost $4 million in capital contributions, which was well in excess of what Goldking LT was contractually obligated to contribute.  However, Wayzata insisted that Tallerine was obligated to contribute additional funds. In response, Tallerine demanded that Wayzata pay him the consulting fees due for his work on the Dune Energy investment so that he could use that money to provide additional capital. Thereafter, Wayzata's attitude toward Tallerine changed completely, and in less than a month Wayzata had initiated a scheme to squeeze him out of the Company.

7.    **WAYZATA'S DECISION TO DESTROY THE COMPANY AS AN OPERATING OIL AND GAS VENTURE**

244.    Under Tallerine's leadership, the Company began with the White Oak acquisition, which included ten properties that had established oil and gas production and the potential for significant new drilling. The agreed business plan was to develop these properties and to continue to acquire properties with additional production and drilling potential, so as to build the size and value of the Company. However, the oil and gas business is risky and unpredictable. Wayzata repeatedly assured Tallerine that they understood that success in the oil and gas business required a high tolerance for risk and the willingness to continue in the face of a certain degree of inevitable disappointments.

245.    While the Company had production from day one, early efforts to boost production through drilling wells in the West Buna Field were not as successful as was hoped. Two initial wells, although completed, produced at a lower initial flow rate than expected. One exploratory well in which the Company had taken an operated interest was disappointing. Hurricanes in 2011 periodically shut down production and resulted in increased costs. Worst of all, natural gas prices fell by more than 50%, resulting in reductions in the Company's cash flow and reserve valuation. As it turned out, Wayzata did not have the stomach or risk tolerance for the oil and gas business. Beginning in the summer of 2012, Wayzata began to apply the brakes to new acquisition efforts and increasingly began to voice pessimism about the Company and the oil and gas industry in general.

246.    Sometime in the fall of 2012, Wayzata apparently decided to change their "risk profile" with respect to their investment in the Company. On information and belief, Wayzata determined that they could make a decent return on their investment if they changed the nature of the Company's business into something with which they were more familiar and comfortable—

distressed debt. In other words, Wayzata would have to cease acquisitions, exploration, and new drilling, eliminate all the cost and overhead of an operating oil and gas company, and then simply collect revenues from existing production until those wells ran dry. In industry terms, Wayzata intended to abandon the operational business and simply "blow down the assets." Their problem was that they had a minority partner who had the reasonable expectations of owning an interest in a real, operating oil and gas company, of managing that company, and of being employed by that company. Wayzata no longer needed Tallerine—and, in fact, needed to get rid of him at the lowest possible cost.

### 8.    THE SQUEEZE OUT

247.    Wayzata secretly hired lawyers and forensic accountants, FTI Consulting, Inc., to fabricate a case to justify the squeeze-out of Tallerine. After months of surreptitious preparation, Wayzata called a board meeting in Minnesota. On December 17, 2012, Tallerine flew Company and Wayzata employees on his private plane to that meeting, where the two Wayzata board members informed Tallerine that he was fired and that he was barred from Company property and from access to his personal records and property.  Tallerine requested a reason, but the Wayzata board members refused to give one; however, Wayzata did bring in their forensic accountants, Philip Innes and FTI Consulting, Inc., to describe their "discovery" of the mishandling of Company funds that had been recorded on the Company's books more than 18 months before. Innes referred to a preliminary report that had been prepared for the Company that documented his conclusions. Tallerine asked for a copy of the report, but Strain and Carlson refused. Innes admitted that the Company had suffered no actual financial loss because all the funds had either been repaid or set off against expense statements. Innes criticized Tallerine's expense statements as being "late," but did not contest the accuracy or validity of the expenses. Wayzata gave Tallerine no notice and no severance.

248.    Although the board terminated Tallerine as an officer and employee, Tallerine remained a member/owner and a manager/director. Wayzata also prepared a termination letter but did not present it directly to Tallerine. Rather, Strain slipped the letter into Tallerine's board meeting notebook, where it was discovered late the next day. Among other things, the letter demanded Tallerine's immediate return of all documents relating to the business of the Company, including documents that Tallerine was clearly entitled to have as a member and a manager.

249.    While Tallerine was still in Minnesota, Wayzata employees descended on the Company's Houston offices with armed, uniformed police officers to seize Tallerine's personal property and take over control. Three employees, Denna Ramsey, Tracy Santoro, and Rosa Tallerine, whom Wayzata thought to be loyal to Tallerine were barred from the Company premises and put on "Administrative Leave." They were subsequently fired without notice or severance. These employees' personal computers, pictures, purses and wallets, bills, and credit cards that happened to be at their desks were seized and detained. All of Tallerine's personal property and records were similarly seized.  Counterclaim Defendant Burns, a Wayzata partner but not an officer or employee of the Company, personally seized Suite 2500A and had the locks changed, after falsely representing to the building that the Company was the tenant on that space. She personally denied to Culotta access to his office in Suite 2500A. Tallerine was permanently barred from entering the Company offices.

250.    All of this was nothing more than an effort to gain leverage over Tallerine in order to squeeze him out of the Company. Wayzata denied Tallerine employment and income, conducted the termination and lock-out so as to cause Tallerine the maximum amount of humiliation and stress, and leveled false and baseless claims against him. At the board meeting

on December 17, Carlson had been given authority to negotiate a resolution with Tallerine. Carlson made it clear to Tallerine at the meeting that Wayzata intended to buy out Tallerine's interest. Tallerine had stated that, since the assets of the Company were working interests that were easily divisible, the parties should simply split up the assets and liabilities and let Tallerine take his 6.25%. Carlson indicated that Wayzata had no interest in allowing Tallerine to take his fair share of the Company. Carlson made this even clearer a few weeks later in an email to Tallerine in which he invited Tallerine to make a settlement offer, but cautioned: "we view this investment as impaired so I am assuming you will keep that in mind as you make a proposal."

8. **TRESPASS, THEFT AND DESTRUCTION OF TALLERINE'S PROPERTY**

251.   On December 17, Wayzata, through its agents and employees and through Company employees and Innes and FTI who were acting at Wayzata's direction, seized all of Tallerine's personal property in the office. Wayzata opened Tallerine's mail, and reviewed and copied all of Tallerine's personal records, including personal financial and medical records, and confidential records relating to Tallerine's other businesses. Wayzata boxed up the obviously personal property, including pictures of Tallerine's grandchildren and other clearly personal items, but neither returned those items nor tendered them. All documents relating to the Company in Tallerine's office were seized and removed, including Tallerine's personal copies of Company organizational documents, board minutes, and other documents that he maintained as a member and manager. Wayzata seized and accessed the data stored on the server that belonged to Tallerine personally, and that contained his personal financial records in QuickBooks and confidential information relating to other businesses. Wayzata and the Company later falsely claimed ownership of the server and refused to return it, but eventually admitted that it belonged to Tallerine and returned it some weeks later—after copying all the data.

252.    On December 18, 2012, counsel for Tallerine contacted Counterclaim Defendant Wallander and demanded the immediate release and return of Tallerine's personal property and of the leasehold at Suite 2500A. This demand was refused. Initially, Wallander falsely claimed that the Company was the tenant and falsely claimed to have records proving ownership of the leasehold. Tallerine's counsel demanded to see those records and provided Wallander with a copy of the lease, which clearly showed Goldking Energy as the tenant. Wayzata broke into locked filing cabinets, damaged property, and used up all the toner in the Tallerine's copy machine copying Tallerine's own records.   Wayzata stalled until all the documents in Suite 2500A were copied, and then after additional demands and negotiation, Wayzata and the Company agreed to turn over possession of Suite 2500A late in the day on December 19 and to return personal property at some indeterminate date in the future after Tallerine's assistant had compiled a list of items in dispute. Wayzata rifled through and copied highly private and personal papers belonging to Tallerine, including tax returns, personal financial information, health insurance information, medical records, personal correspondence, and confidential records relating to Tallerine's other businesses.

253.    On December 20, Denna Ramsey was given access to her property and noticed that much of Tallerine's obviously personal property was boxed up in his office. Ramsey requested permission to take these items to Tallerine, but was refused. Later that day, Tallerine's attorney demanded that the clearly personal items that were already boxed up be returned, that Tallerine's personal copies of board meetings and organizational documents (that he maintained as an owner and manager and that were needed by his counsel) be returned, and that Tallerine be permitted to retrieve the contents of his personal safe that was bolted inside the credenza in his office (also his personal property). The safe contains documents of a highly personal and private

nature, including divorce records and wills and estate planning records, and in which Tallerine has a reasonable expectation of privacy. Wayzata refused to return or acknowledge Tallerine's right to possess his personal copy of board minutes and other documents relating to the Company. Wayzata falsely claimed that the Company had installed the safe (which Tallerine had owned since the late 1990s) and refused to allow the return of the safe until they had reviewed each item in the safe.

254.    Wayzata refused to return any of Tallerine's furniture, equipment or artwork until his assistant created a list of items that belonged to Tallerine. Wayzata refused to permit any attorneys to be present or to assist. Wayzata otherwise stalled and stonewalled the process in an effort to increase the cost and inconvenience to Tallerine, so that Tallerine did not get back his personal property until February 22, 2013. All of the computer equipment that was eventually returned had its data copied, and much of the equipment had sustained damage. Wayzata refused to return the credenza and safe and continues to hold those items.

255.    Three of the offices within the Company's suite were under a separate lease to Goldking Energy. The intent was eventually to have those offices staffed by separate employees of Tallerine's other businesses and to carry on the business of those companies in that space. Until that could happen, the Company was using the space for storage and was paying the rent. After December 17, the Company refused to continue paying rent and claimed no longer to be using the space.  However, the Company also refused to grant Tallerine access to his own leased offices. Ultimately, Tallerine had to pay the landlord $4600.00 to terminate the lease on that space.

### 9.    THEFT AND DESTRUCTION OF CULOTTA'S PROPERTY

256.    Culotta had ceased to be the Company's CFO in early October 2011, but continued to be an employee of the Company until the end of the year, reporting to Tallerine and

Hebert. Tallerine agreed to provide office space to Culotta in Suite 2500A. Culotta executed a Separation Agreement and a Confidential General Mutual Release with the Company on October 12, 2011. Under the terms of these agreements, Culotta was to continue to receive his parking privileges on the same terms as during his employment through December 31, 2012, and the Company gave Culotta a full and complete release of all claims, known or unknown, and covenanted never to sue on any of the released claims. Tallerine agreed to provide Culotta with workspace in Suite 2500A for the period following his termination of employment. Culotta provided consulting services to the Company as an independent contractor, and he also provided service to other clients. He maintained personal and business records in locked file cabinets in Suite 2500A.

257.    On December 17, 2011, when Culotta was barred from entering his office, he personally informed Burns and Strain that Suite 2500A did not belong to the Company and contained Culotta's personal property and records that were in locked filing cabinets. Wayzata cut off the locks, broke into the filing cabinets, and then reviewed and perhaps copied all of Culotta's documents in Suite 2500A, including his personal financial and tax records, Walker Street's personnel and financial records, and documents relating to his work for other clients—including privileged documents relating to work as a consulting expert on several litigation matters. Wayzata also stole Culotta's work product relating to consulting work he had done for the Company during 2012. This was work he had done as an independent contractor with no agreement that his work product belonged to the Company.

258.    Beginning on or about December 17, 2011, the Company also breached Culotta's contract by terminating his parking privileges and allowing Strain to park in Culotta's reserved parking space.

### 10.     COMPLETION OF SQUEEZE OUT

259.     The Company had a line of credit with Bank of America that had a balance of $10.5 million. During most of the Company's history, the Company was not able to comply fully with all of the non-monetary covenants in the loan agreements; however, the Company was never in monetary default and routinely obtained waivers and forbearance on these technical defaults. The allegation in the Petition that the defaults were somehow related to the mishandling of Company funds in the summer of 2011 is absolutely false.  In the fall of 2012, either at the instigation of Wayzata or through utter dereliction of duty, Hebert submitted a written request for a $1 million draw on the line of credit and falsely represented that the Company was in compliance on all its covenants. Hebert knew the representation was false, and Bank of America knew the representation was false, and the submission of the false written representation coupled with a substantial draw request created a crisis in the Company's relationship with the bank. Strain and Carlson insisted on having Wallander handle all negotiations with the bank, claiming that Wayzata had an excellent relationship with Bank of America.

260.     Wallander did not obtain waivers for the technical defaults as the Company had been granted in the past. Bank of America offered to dispense with the nonmonetary covenants if Wayzata would guaranty the loan, but Wayzata refused. Wayzata did not obtain alternative credit for the Company from another commercial lender. Rather, Wayzata negotiated with the bank to purchase the debt and jacked up the interest rate that the Company was paying to 15%. This was an insider transaction in which Wayzata profited at the Company's expense. A 15% interest rate on a commercial loan might represent what Wayzata is permitted to extort in a third-party transaction, but here Wayzata is an insider that owes fiduciary duties to the Company. The interest rate charged greatly exceeds the level of risk that Wayzata is actually taking in a company that it controls—particularly now that Wayzata has changed the "risk profile" of the

company and will simply collect the revenues of existing production. The transaction was not entirely fair to the Company and was done in bad faith as part of the squeeze-out scheme, because it would allow Wayzata to siphon off the Company's net production revenue without having to make distributions that might benefit Tallerine.

261.    Wayzata also decimated the Company's ability to operate by drastically cutting staff and overhead. Wayzata fired most of the technical staff, including the senior experienced engineer. As a result, the Company fouled the completion of the Blue Bar well in February 2013—a well already scheduled for drilling at the time of the ouster of Tallerine. The loss of the Blue Bar well did significant harm to the Company. Also, either through gross negligence or disregard of the Company's best interests, Wayzata failed to have the Company make the State of Louisiana lease rental payment on Main Pass 84, resulting in the loss of that lease and the loss of over $16 million in booked reserves.  Wayzata has also caused the Company to fail to drill the Zulu well on time, which will result in significant loss to the Company and a breach of its agreement with a third party working interest owner.

262.    With respect to Tallerine, Wayzata continued to apply squeeze-out pressure. Although still a manager and an owner, Wayzata caused the Company to exclude him from all meaningful access to information and participation. On January 9, 2013, Tallerine made a formal, written demand for information and access to Company records. The Company responded by asserting that it had the authority to determine what information one of its managers was entitled to receive and refusing to comply with the request, with the exception of providing two minor daily reports of limited utility.

263.    Wayzata continued to apply financial pressure by making demands that Tallerine pay additional money pursuant to a capital call. On February 1, 2013, Tallerine's counsel wrote

to counsel for Wayzata and the Company and pointed out that Tallerine was not obligated by the Amended Agreement make additional contributions, absent the written agreement of Goldking LT. Notwithstanding this notice, Wayzata continued to violate the Amended Agreement by claiming that Tallerine was obligated to make additional capital contributions, including the completely false statement in the Petition that Goldking LT's failure to comply with the capital call would reduce its ownership percentage. To add insult to injury, the Company has failed and refused to pay Goldking Energy invoices, totaling $52,728.33, for the Company's use of the plane, including the flight on December 17 transporting Tallerine, Hebert and Strain to the board meeting in Minnesota, where the squeeze-out was launched.

264.    On January 24, 2013, Tallerine requested a board meeting. On January 29 and 30, Wallander sent emails to Tallerine attempting to get his agreement, without a meeting or any real information, to execute board resolutions to have the Company enter into certain hedging transactions and to have Wayzata purchase the Company's bank debt and charge the Company 15%. Tallerine's counsel responded on February 1 that Tallerine could not agree to execute resolutions without a meeting and without access to any Company information and that Wayzata's proposed debt acquisition was a self-dealing transaction that seemed grossly unfair to the Company.

265.    Wayzata's counsel also represented to Tallerine's counsel that Strain and Carlson would schedule a board meeting for the second week of February. They did not. Rather, on February 13, Carlson emailed Tallerine that Wayzata was removing him from the board for cause pursuant to §6.03 of the Amended Agreement. This bad faith act violated the Amended Agreement, first because Wayzata knew that good cause did not exist, second because the basis claimed for Tallerine's removal had nothing to do with any of his conduct as a manager, and

third because the duties claimed to have been violated were waived as to managers in §6.8 of the Amended Agreement. Tallerine responded on behalf of Goldking LT by exercising its "sole and exclusive right to designate a replacement" for a manager who is removed and placed himself back on the board. Carlson responded by refusing to recognize Tallerine as a replacement, again in violation of the Amended Agreement. Wayzata's counsel confirmed this refusal in a letter sent on February 26, 2013.

### 11.    BASELESS AND BAD FAITH CLAIMS

266.    Section 12.7 of the Amended and Restated Limited Liability Company Agreement of Goldking Holdings, LLC contains a dispute resolution mechanism that provides for confidential negotiation and arbitration of disputes between the members. In the spirit of that agreement, Tallerine and Goldking LT Capital Corp. submitted a statement of their dispute on December 27, 2012, stating all the claims stated herein, including the claims for shareholder oppression, and responding to the claims relating to the mishandling of funds.  Wayzata II responded on January 11, 2013, stating that "we disagree that the oppressive acts Wayzata is alleged to have performed, listed on page 7 of the Statement are all arbitrable under Section 12.7(b)" and "reserve[ing] all of its rights to contest the applicability of Section 12.7(b) to all the claims and allegations in the Statement." Thereafter, Wayzata refused to engage in good faith negotiations, to meet, or even to respond to offers made by Tallerine during the 60-day period after the statement, as required by Section 12.7.  The parties did not commence arbitration on February 25, 2013 as was required by Section 12.7. Rather, Wayzata II caused the Plaintiffs to file this action on February 13, 2013.

267.    Wayzata's refusal to submit to the dispute resolution mechanism and to cause this Petition to be filed in court was just another effort to publicly embarrass Tallerine and bring additional squeeze-out pressure on him. In addition to the numerous false statements and claims

in the Petition, the bad faith nature of the Petition is demonstrated by the filing of claims against Culotta. Every single act alleged in the Petition to have been committed by Culotta occurred prior to the Release. The only thing Culotta is alleged to have done after the Release is to "continue to be involved in this scheme"—notwithstanding the fact that he was merely a consultant, did not work in the Company's offices, did not have access to the Company's books and financial records, and had no duty whatsoever to the Company or to Wayzata. Culotta is alleged to have somehow deceived the auditors, when he was the individual that oversaw the recording of every challenged transaction in the Company's books that were the subject of the audit. The Petition alleges that Tallerine paid back the funds only because he was forced to do so by the accounting department, yet Wayzata caused the Company to sue Culotta, who headed the accounting department, and who was the individual who called Tallerine and notified him of the need to make the transfers that rectified the errors, and who prepared the report of all the transactions that are the basis of the allegations in the Petition, and who personally provided that report to Hebert, Wayzata's hand-picked CFO.

## D.    AFFIRMATIVE DEFENSES

268.    Defendants aver that their conduct with respect to Plaintiffs was done in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the Plaintiffs.

269.    Defendants aver that the transactions alleged in the Petition were entirely fair to the Plaintiffs.

270.    Defendants plead payment and novation as described herein.

271.    Defendants aver that Plaintiffs' claims are barred by Section 6.8 of the LLC Agreement, which eliminates duties that managers may have to the company, the members, and the other managers for actions taken on behalf of the member that designated them.

272.    Defendants aver that Plaintiffs' claims are barred by Section 6.10 of the LLC Agreement, which expressly permits Tallerine to pursue the outside business ventures made the subject of the claims.

273.    Defendants plead that Plaintiffs' claims are barred by the doctrines of waiver, estoppel, and ratification.

274.    Defendants plead accord and satisfaction.

275.    Defendants plead offset.

276.    Defendants plead good faith reliance upon the records of the limited liability company and upon information, opinions, reports or statements presented by another manager, member, officer or employee of the limited liability company, pursuant to §18-406 of the Delaware Limited Liability Company Act.

277.    Defendants plead the business judgment rule.

278.    Defendants plead accident or mistake.

279.    Defendants plead material breach and unclean hands.

280.    Defendant Culotta pleads compromise, settlement and release.

**E.    CAUSES OF ACTION**

**1.    INDEMNIFICATION AND ADVANCEMENT OF EXPENSES**

281.    Goldking LT, Tallerine, and Culotta assert claims for indemnification and advancement of expenses against the Company.

282.    Goldking LT as a member of the Company and Tallerine and Culotta as former officers of the Company are "Covered Persons" within the meaning of Section 8.1 and Section

8.11 of the Amended Agreement.  Pursuant to Section 8.1, Goldking LT, Tallerine, and Culotta are entitled to be indemnified and held harmless against all expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or it in connection with any threatened, pending or completed claim, demand, action, suite or proceeding other than an action by or in the right of the Company. Section 8.2 provides the same indemnification in actions, suits or proceedings by or in the right of the Company.

283.     This action is a claim for which Goldking LT, Tallerine, and Culotta are entitled to indemnification pursuant to Section 8.2. Wayzata II has threatened and asserted claims against Goldking LT, Tallerine and Culotta for which they are entitled to indemnification under Section 8.1. These claims have been threatened or asserted against Goldking LT, Tallerine, and Culotta by reason of the fact that each of them is or was a Covered Person. With respect to all alleged acts and omissions made the basis of such claims, Goldking LT, Tallerine, and Culotta each acted in good faith and in a manner that he or it reasonably believed to be in or not opposed to the Company's best interests.

284.     Furthermore, pursuant to  Section 8.7, all expenses incurred by Goldking LT, Tallerine, and Culotta in defending or investigating these claims is required to be paid by the Company in advance of the final disposition of any threatened or pending action upon receipt of an undertaking by or on behalf of such Covered person to repay such amount if it shall ultimately be determined that he or it is not entitled to be indemnified by the Company.

285.     As a result of the suit filed by the Company and the claims threatened and asserted by Wayzata II, Goldking LT, Tallerine, and Culotta have been forced to retain counsel to investigate and defend such claims, and Goldking LT and Tallerine have further been forced to undertake the defense of its affiliates against whom claims for conspiracy and aiding and

abetting have been alleged and who have common law rights of indemnification.  The Company

has received an undertaking by Goldking LT on behalf of itself, Tallerine, and Culotta and an

undertaking by Culotta to repay such amount if it shall ultimately be determined that he or it is

not entitled to be indemnified by the Company.  Therefore, Goldking LT, Tallerine, and Culotta

are entitled to immediate payment of all expenses and attorneys fees incurred currently and

hereafter.

286.      Pursuant to Section 12.7(a), Goldking LT, Tallerine and Culotta are entitled to an

order specifically enforcing the mandatory advancement of expenses provision. Goldking LT,

Tallerine and Culotta are further entitled to recover all reasonable and necessary attorneys' fee

incurred in the enforcement of  Section 8.7, pursuant to Texas Civil Practice Remedies Code

§38.001.

### 2.      FAILURE TO PAY PLANE EXPENSES

287.      Goldking Energy and Tallerine assert claims of breach of contract against the

Company for failure to pay reimbursement of plane expenses.

288.      A valid and enforceable written agreement between Tallerine and the Company

required the Company to pay or reimburse Goldking Energy and Tallerine for the use of a 1980

British Hawker airplane owned by Goldking Energy. In return for use of the airplane, the

contract obligates the Company to pay invoices for said use at an industry standard charge.

Goldking Energy and Tallerine fully performed and issued invoices in conformity with the

contract. The Company has failed to pay a number of these valid invoices.

289.      Goldking Energy kept a systematic record of the amounts charged to the

Company's account and such amounts are stated in the invoices. This statement of account is just

and true, is due, and all just and lawful offsets, payments, and credits have been allowed.  The

total amount due and payable is $52,728.33.

290.    Goldking Energy and Tallerine are entitled to an award of liquidated damages in the amount of $52,728.33, as well as costs and reasonable and necessary attorney's fees pursuant to Texas Civil Practices and Remedies Code § 38.001(1). Presentment has been made.

### 3.    THEFT OF SERVICES—PLANE

291.    Goldking Energy and Tallerine assert claims under the Texas Theft Liability Act for theft of services against the Company and Wayzata.

292.    Pursuant to the Texas Theft Liability Act, a person who commits theft is liable for the damages resulting from the theft. Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by §§ 31.03–31.07, or 31.11–31.14 of the Texas Penal Code.[5] In pertinent part, Texas Penal Code § 31.04(a)(4) provides that a person commits theft of service if, with the intent to avoid payment for service that the actor knows is provided only for compensation, the actor intentionally or knowingly secures the performance of the service by agreeing to provide compensation and, after the service is rendered, fails to make full payment after receiving notice demanding payment.[6]

293. As alleged herein, the Company committed theft of the airplane services. Pursuant to CPRC §134.005, Tallerine and Goldking Energy are entitled to recover their actual damages in the amount of $52,728.33, and in addition to that sum, additional damages in a sum not to exceed $1,000.00, as well as court costs and reasonable and necessary attorney's fees.

### 4.    FAILURE TO PAY CONSULTING FEE

294.    Tallerine asserts claims for breach of contract or in the alternative quantum meruit against Wayzata Investment Partners and Wayzata II.

---

[5] Tex. Civ. Prac. & Rem. Code §134.002(2)
[6] Tex. Pen. Code Ann. § 31.04 (Vernon).

295.     A valid, enforceable oral agreement between Tallerine, on the one hand, and Wayzata Investment Partners and Wayzata II, on the other, existed for Tallerine to provide consulting services to Wayzata Investment Partners and Wayzata II with regard to investments in and dealings with Dune Energy. Wayzata Investment Partners and Wayzata II, through its officers Halloran, Strain and Carlson, agreed to pay Tallerine a consulting fee equal to 6.25% of whatever profits Wayzata II realized on its Dune Energy investments. Tallerine performed the consulting services, and Wayzata II realized a profit of $40 million on its Dune Energy investments. Wayzata Investment Partners and Wayzata II owe Tallerine a consulting fee in the amount of $2.5 million.  Tallerine has been damaged by the breach, and is entitled to actual damages in the amount of $2.5 million, as well as costs and reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code § 38.001.

296. In the alternative, Tallerine provided valuable consulting services to Wayzata Investment Partners and Wayzata II with regard to their investments in and dealings with Dune Energy. These consulting services were provided for Wayzata Investment Partners and Wayzata II. Wayzata Investment Partners and Wayzata II accepted these services and acted in accordance with the advice given. Furthermore, Tallerine expressly stated to Wayzata Investment Partners and Wayzata II that he expected compensation for his services. Wayzata Investment Partners and Wayzata II, through its officers Halloran, Strain, and Carlson, recognized Tallerine's expectation of payment, and agreed to pay. Tallerine is entitled to receive the reasonable and customary value of his services. Tallerine is entitled to actual damages in the approximate amount of $2,500,000.00, as well as costs and reasonable and necessary attorney's fees pursuant to Texas Civil Practices and Remedies Code § 38.001.

### 5.      THEFT OF SERVICES—CONSULTING

297.      Tallerine asserts claims under the Texas Theft Liability Act for theft of services against Wayzata Investment Partners and Wayzata II.

298.      Wayzata Investment Partners and Wayzata II committed theft of Tallerine's consulting services because they knew, and were expressly told by Tallerine that these services would be provided only for compensation. Wayzata Investment Partners and Wayzata II recognized this fact by offering to pay a consulting fee. After notice, Wayzata Investment Partners and Wayzata II failed and refused to make any payment whatsoever for the consulting services.

299.      Pursuant to Texas Civil Practice and Remedies Code § 134.005, Tallerine is entitled to recover his actual damages in the amount of $2,500,000.00, and in addition to that sum, additional damages in a sum not to exceed $1,000.00, as well as court costs and reasonable and necessary attorney's fees.

### 6.      FRAUD

300.      Tallerine asserts claims for common law fraud against Wayzata Investment Partners and Wayzata II.

301.      Wayzata Investment Partners and Wayzata II made false promises to Tallerine to pay him a consulting fee out of whatever profits Wayzata realized on its Dune Energy investments the same percentage Tallerine owned in the Company. Wayzata Investment Partners and Wayzata II made this promise with no intention to perform. This representation was material, and Tallerine relied on the representation in deciding to offer the consulting services. Wayzata Investment Partners and Wayzata II made the representation with the intention that Tallerine would rely upon it. Wayzata Investment Partners and Wayzata II made the representation with knowledge of its falsity.

302.     As a result of the above fraud by Wayzata Investment Partners and Wayzata II, Tallerine has suffered actual damages in the approximate amount of $2,500,000.00. Moreover, Wayzata Investment Partners and Wayzata II has committed fraud willfully, wantonly, intentionally, maliciously, and with gross disregard of the rights of others. Tallerine is therefore entitled to exemplary damages.

### 7.     CONVERSION

303.     Tallerine and Culotta assert claims for conversion against all Counterclaim Defendants.

304.     Tallerine and Culotta owned, possessed, and had the immediate possessory rights over personal property in both the Company offices, as well as in Goldking Energy's leased Suite 2500A in the same building. Such property in the Company offices included furniture, artwork, and equipment, personal copies of the corporate records of the Company, personal pictures, and a safe in which Tallerine's personal records are kept. Property in Suite 2500A included desks, computers, files, and printers. This property was the personal property of Tallerine. Culotta also had locked filing cabinets with personal files inside, including personal tax returns, Walker Street Consulting invoices and business records, confidential documents, personal copies of other papers, and computer and office equipment in 2500A. Counterclaim Defendants wrongfully exercised dominion and control over the various items of personal property of Tallerine and Culotta on December 17, 2012, by seizing 2500A, and locking Tallerine and Culotta out of 2500A and the Company offices. Counterclaim Defendants sawed off the locks to Culotta's filing cabinet and rummaged through, and kept various work paper records of Culotta's work product done as an independent contractor. Defendants refused to return or release the property after demand.

305.     Counterclaim Defendants released 2500A on December 19, 2012, however Counterclaim Defendants remain in possession of Culotta's personal property work papers, and Tallerine's credenza and safe, including its highly personal and private contents. Counterclaim Defendants gradually returned most of Tallerine's personal property, but retained possession of the artwork and furniture for over a month, and never returned Tallerine's personal copy of corporate records. Additionally, computer equipment belonging to Tallerine was damaged by the Counterclaim Defendants.

306.     Culotta and Tallerine are entitled to either the damages for the lost value of the property or loss of use damages on the items returned to them. For the items, which have yet to be returned, Tallerine and Culotta are entitled to the full value of the converted property or injunctive relief, specifically, for return of the personal items still within Counterclaim Defendants' wrongful possession, including the safe and credenza. Tallerine seeks return of the safe without being opened by Counterclaim Defendants. Furthermore, Counterclaim Defendants committed conversion willfully, wantonly, intentionally, maliciously, and with gross disregard of the rights of others. Tallerine is therefore entitled to exemplary damages.

**8.     INVASION OF PRIVACY**

307.     Tallerine and Culotta assert claims for invasion of privacy against all Counterclaim Defendants.

308.     By seizing the personal property of Tallerine and Culotta within the Company offices and within Suite 2500A, and subsequently cutting the locks off of Culotta's file cabinet in which highly sensitive medical, financial, and personal information was stored, Counterclaim Defendants made an actual physical intrusion on the privacy of Culotta. Entering a private office without permission has been found to be an actionable intrusion in Texas. Culotta had a reasonable expectation of privacy with regard to his locked file cabinets and information

regarding his personal private matters inside, especially in light of the fact that Culotta's file cabinet was within Suite 2500A, which was leased by Tallerine, and not within any property owned or leased by Counterclaim Defendants. An ordinary person would feel severely offended, humiliated, and outraged by such an intrusion into their locked-up personal medical files and financial documents as Culotta has suffered.

309.    Tallerine had his personal financial information, insurance, medical documents and confidential information relating to his other companies within Suite 2500A. Upon seizure of the office by Counterclaim Defendants, these sensitive private documents were reviewed and, on information and belief, copied. Furthermore, in the safe that Counterclaim Defendants have been commandeered, Tallerine keeps extremely personal information such as divorce papers, estate planning documents, and medical records. The safe is within Tallerine's office located inside the Company's offices. Counterclaim Defendants have seized the safe, continue to maintain wrongful possession of it, and refuse to release the safe to Tallerine, after demand, until they crack it open and review the contents. An ordinary person would feel severely offended, humiliated, and outraged by such an intrusion into the lease space, a review of numerous confidential and personal documents, and the holding hostage of a safe within which a person's most sentimental and important documents are held.

310.Culotta and Tallerine were injured by Counterclaim Defendants' intrusion, and are entitled to mental anguish damages, including anger, humiliation, and distress, and costs of court. Furthermore, Counterclaim Defendants committed invasion of privacy willfully, wantonly, intentionally, maliciously, and with gross disregard of the rights of others. Tallerine is therefore entitled to exemplary damages. Furthermore, given the despicable conduct of Counterclaim Defendants, Culotta and Tallerine are entitled to equitable attorney's fees.

### 9.     TRESPASS TO REAL PROPERTY

311.     Goldking Energy asserts claims for trespass to real property against all Counterclaim Defendants.

312.     Goldking Energy is the lessee of Suite 2500A, and as such owns the exclusive lawful right to occupy and possess such premises. Counterclaim Defendants made an intentional, voluntary and physical invasion into 2500A, and seized control thereof, changed the locks, damaged property, and excluded Tallerine and Goldking Energy personnel. Counterclaim Defendants not only locked out the rightful lessee, but also invaded the office and inspected all of the contents. Counterclaim Defendants' trespass caused injury to Goldking Energy's right of possession to the lease space. The Company also seized possession of the three offices within its Suite that are leased by Goldking Energy, refused to pay rent on that space, but barred Tallerine and Goldking Energy from access and possession. Goldking Energy is entitled to recover its actual damages, including loss of use. Because Counterclaim Defendants acted with malice, Goldking Energy is entitled to exemplary damages, and due to the outrageous behavior of Counterclaim Defendants, Goldking Energy is entitled to equitable attorney's fees. Goldking Energy is also entitled to costs.

### 10.     BREACH OF CONTRACT—SEPARATION AGREEMENT AND CONFIDENTIAL GENERAL MUTUAL RELEASE

313.     Culotta asserts claims for breach of contract against the Company.

314.     By the acts alleged herein, the Company breached its Separation Agreement and Confidential General Mutual Release with Culotta. Therefore, Culotta is entitled to his actual damages proximately caused by this breach of contract, together with reasonable and necessary attorneys' fees pursuant to Texas Civil Practice and Remedies Code §38.001.

### III. CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants and Counterclaim Plaintiffs LEONARD C. TALLERINE, JR.; GOLDKING ENERGY CORPORATION; GOLDKING ENERGY PARTNERS II, LLC; GOLDKING CAPITAL MANAGEMENT, LLC; RETA WELLWOOD DBA VERMILLION CONTRACTING CO.; PAUL CULOTTA; and GOLDKING LT CAPITAL CORP. respectfully request that the Plaintiffs take nothing by their claims, and further request that upon trial on the merits, judgment be entered against all Counterclaim Defendants awarding the following relief to Counterclaim Plaintiffs:

    a. Actual Damages;

    b. Equitable Relief, including forced buy-out, disgorgement, rescission, partition, mandamus, or otherwise;

    c. Exemplary Damages, and additional damages and penalties as provided by statute;

    d. Prejudgment Interest;

    e. Postjudgment Interest;

    f. Reasonable and Necessary Attorneys Fees and Expenses;

    g. Costs of Court;

    h. And such other and further relief to which Counterclaim Plaintiffs may be justly entitled.

Respectfully Submitted,

FRYAR LAW FIRM, P.C.

___/s/ Eric Fryar_____
  F. Eric Fryar
  Texas Bar No. 07495770
  Email: eric@fryarlawfirm.com
  912 Prairie Street, Suite 100
  Houston, Texas 77002-3145
  Tel. (281) 715-6396
  Fax (281) 715-6397

*Attorney in Charge for Defendants-Counterclaim Plaintiffs LEONARD C. TALLERINE, JR.; GOLDKING ENERGY CORPORATION; GOLDKING ENERGY PARTNERS II, LLC; GOLDKING CAPITAL MANAGEMENT, LLC; RETA WELLWOOD DBA VERMILLION CONTRACTING CO.; GOLDKING LT CAPITAL CORP. and PAUL CULOTTA*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on all parties of record by the Southern District of Texas CM/ECF:

___/s/ Eric Fryar_____
Eric Fryar